# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLORADO

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| RENT-RITE SUPER KEGS WEST LTD | ) | Case No. 17-21236-TBM |
| | ) | Chapter 11 |
| Debtor. | ) | |
| | ) | |
| ———————————————— | ) | |
| | ) | |
| RENT-RITE SUPER KEGS WEST LTD, | ) | Adversary Proceeding |
| | ) | Case No. 18-01099-TBM |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| WORLD BUSINESS LENDERS, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

---

## DEFENDANT WORLD BUSINESS LENDERS, LLC'S
## ARGUMENT AND MEMORANDUM OF LAW

---

World Business Lenders, LLC, ("WBL") through its attorney Phillip J. Jones of the law firm of Williams, Turner & Holmes, P.C., files this its Argument and Memorandum of Law and would state:

This is an action for declaratory judgment which centers around a promissory note given by the Debtor's predecessor in interest to the Defendant World Business Lenders, LLC's predecessor in interest, concerns the enforceability of the interest rate provided in that promissory note, and whether Colorado law governs or Wisconsin law governs the enforceability of that promissory note

The parties have stipulated to the following facts and exhibits.

**<u>Stipulated Facts</u>:**

1.      WBL is a New York limited liability company with its principal place of business at 101 Hudson Street, 33rd Floor, Jersey City, NJ 07302.

1

2.      The Promissory Note and Security Agreement ("WBL Note") was executed on April 19, 2016 in the principal amount of $555,000 between CMS Facilities Maintenance, Inc. as Borrower and the Bank of Lake Mills as Lender.

3.      The WBL Note is secured by a Deed of Trust on real property previously owned by Yosemite Management, LLC and now owned by Rent-Rite, described as:

> LOTS 8 THROUGH 31, BLOCK 1, COLFAX SQUARE, AND THE VACATED WEST 10 FEET OF AKRON STREET ADJACENT THERETO, VESTED IN THE OWNER OF SAID LOTS 8 THROUGH 31 BY VIRTUE OF ORDINANCE NO. 61-4 OF THE CITY OF
>
> AURORA RECORDED JANUARY 24, 1964 IN BOOK 1492 AT PAGE 240, COUNTY OF ARAPAHOE, STATE OF COLORADO
>
> also known by street and number as: 1400 YOSEMITE ST, DENVER, CO 80220 (the "Property").

4.      The terms of the WBL Note are as follows: (i) repayment of the principal amount of $550,000 commencing on April 25, 2016 and on each business day thereafter until April 24, 2017; (ii) interest rate at 0.33112328761% per day of the unpaid balance; (iii) daily payments equaling $3,775.72, followed by a final payment of $3,771.34 on April 25, 2017.

5.      On June 13, 2016, Bank of Lake Mills assigned the Deed of Trust to WBL.

6.      On December 6, 2017, Yosemite Management executed a special Warranty Deed to Rent-Rite.

7.      On December 4, 2017, Yosemite Management and Rent-Rite executed the Purchase and Sale Agreement.

8.      On December 6, 2017, Rent-Rite executed a Promissory Note in the $1,963,106.00 ("Rent-Rite Note").

9.      The Rent-Rite Note is secured by a Deed of Trust on property described as

> LOTS 8 THROUGH 31, BLOCK 1, COLFAX SQUARE, AND THE VACATED WEST 10 FEET OF AKRON STREET ADJACENT THERETO, VESTED IN THE OWNER OF SAID LOTS 8 THROUGH 31 BY VIRTUE OF ORDINANCE NO. 61-4 OF THE CITY OF
>
> AURORA RECORDED JANUARY 24, 1964 IN BOOK 1492 AT PAGE 240, COUNTY OF ARAPAHOE, STATE OF COLORADO
>
> Known as No. 1400 Yosemite Street, Denver, Colorado 80220.

2

10.     CMS Facilities Maintenance defaulted on the WBL Note.

11.     On February 26, 2018, WBL filed a Proof of Claim in the amount of $658,652.95 and identifies the annual interest rate to be applied as 120.86%.

**Stipulated Exhibits**

1.      Business and Promissory Note and Security Agreement dated April 19, 2016.

2.      Deed of Trust dated April 21, 2016 and recorded on April 26, 2016 in Arapahoe County, Colorado, Reception No. D6042826.

3.      Assignment of Deed of Trust dated June 13, 2016.

4.      Purchase and Sale Agreement dated December 4, 2017 between Rent-Rite Super Kegs West, Ltd. and Yosemite Management, LLC.

5.      Promissory Note dated December 6, 2018 executed by Rent-Rite Super Kegs West, Ltd.

6.      Deed of Trust dated December 6, 2017 executed by Rent-Rite Super Kegs West, Ltd.

7.      Special Warranty Deed dated December 6, 2017 executed by Yosemite Management, LLC

8.      Proof of Claim dated February 26, 2018.

B.      Continuing Guaranty, Personal (Unlimited) signed by Craig Harold Heber and Thomas Stuart Wright dated April 19, 2016.

C.      Continuing Guaranty, Personal (Limited) ("Guaranty") signed by Craig Harold Heber and Thomas Stuart Wright dated April 20, 21016.

D.      UCC Financing Statement filed April 25, 2016.

H.      WBL Statement dated 5/23/2018 to MS Facilities Maintenance, Inc. for Account No. 19262.

### ISSUE

The issue for this Court is what interest rate should apply on the WBL Note. Does the interest rate as agreed by the parties and governed by the laws of the State of Wisconsin apply or does the interest rate of the State of Colorado govern?

## ARGUMENT

The promissory note entered into between the parties' predecessors in interest (Exhibit 1) specifically provides in paragraph 15(c) that the legality, enforceability and interpretation of the note would be governed by the laws of Wisconsin.

Restatement (Second) of Conflict of Law provides in § 187: "(1) The law of the state chosen by the parties to govern their contractual rights and duties will be applied if the particular issue is one which the parties could have resolved by an explicit provision in their agreement directed to that issue."

Colorado law has long accepted the choice of law doctrine. Colorado courts have held that parties may agree as to what state law will govern and control the contract. In *McKay v. Belknap Sav. Bank*, 59 P. 745, (Colo. 1899), the Colorado Supreme Court stated "[W]hen, on the place of contract, the rate of interest differs from that of place of payment, the parties may stipulate for either rate, and the contract will govern, the parties having the right of election as to the law of which place the contract is to be governed." (P. 747)

The ruling of the *McKay* case (supra) has been cited in *Eccles v. Herrick*, 15 Colo. App. 350 (Colo. App. 1900), where the appellate court ruled the parties are bound by the rate of interest permissible by the law of the state the parties elected to be governed. The appellate court ruled "it was wholly unimportant what the prevailing rate of interest may have been in Colorado in cases of this sort" (p. 353) when the parties had elected the promissory note to be governed by the state of New Hampshire.

In *Baxter v. Beckwith*, 1913 Colo. App. LEXIS 210, (Colo. App. 1913), the Colorado Appellate Court ruled:

> The parties may legally stipulate for the payment of interest according to the laws of the state where the instrument is made, or according to the laws of the place of payment, and the rate thus agreed upon may be recovered, although it may be illegal under the laws of the other state.

In *Lehman Bros. Holdings v. Universal Am. Mortg. Co.*, 12 F. Supp. 3d 1355, (D. Colo. 2014), the district court found that absent special circumstances, courts will honor such contractual choice-of-law provisions. (P. 1360)

The United States District Court in the case of *L'Asbalete, Inc. v. Zaczac*, 474 F. Supp. 2d 1314 (Fla. S.D. 2007), where the defendant challenged a note as being usurious under Florida law, the court ruled the parties had expressly selected that Delaware law would govern their transaction and upheld the higher interest rate.

4

The court specifically ruled that Florida courts will generally enforce choice-of-law provisions and stated that such choice-of-law provisions are presumed valid unless the party seeking the avoidance of the enforcement can establish that the foreign law contravenes strong public policy of the forum jurisdiction. The court went on to state "[t]he term 'strong public policy' means that the public policy must be sufficiently important that it outweighs the policy protecting freedom of contract." (P. 1321)

The district court further found that courts will enforce choice-of-law provisions even if **the provisions were expressly designed to evade the state's usurious laws**. (Emphasis added.)

Citing the Florida Supreme Court in the case of *Continental Mortgages Investors v. Sailboat Key, Inc.*, 395 So. 2d 507 (Fla. 1981), the district court ruled the Florida Supreme Court had explained there is no public policy support for enforcing Florida's usury law when the parties selected the law of another jurisdiction to enforce its agreement. The court further concluded that "only in rare exceptions will a court not enforce an interest rate provision agreed upon by the parties." The court, citing the Florida Supreme Court, stated "usury is a field where this policy of validation is particularly apparent . . . [T]he courts deem it more important to sustain the validity of a contract, and thus to protect the expectations of the parties, then to apply the usury law of any particular state." (P. 1322)

In the case of *Ferdie Sievers & Lake Tahoe Land Co. v. Diversified Mortgage Investors*, 603 P.2d 270, (Nev. 1979), the Nevada Supreme Court upheld the interest rate on a promissory note which was usurious under Nevada law but the parties agreed the law of Massachusetts would control.

The Nevada Supreme Court stated "[I]t is well settled that the expressed intentions of the parties as to the applicable law in the construction of a contract is controlling if the parties acted in good faith and not to evade the law of the real situs of the contract." (P. 274)

The court went on to state "Under choice-of-law principles, parties are permitted within broad limits to choose the law that will determine the validity and effect of their contract." (P. 274)

The Supreme Court of Arizona in the case of *Burr v. Renewal Guar. Corp.*, 468 P.2d 576 (Ariz. 1970) upheld a note that provided for the application of Colorado interest rate which was greater than the interest rate permitted in Arizona. In doing so the Arizona Supreme Court ruled the parties had agreed Colorado law would govern the construction and enforcement of the parties' agreement. In the *Burr* case, the defendant resided in Arizona, read an ad in a trade journal that the lender specialized in certain loans, and the defendant applied for the loan. The note was prepared in Colorado, sent to the defendant in Arizona to sign, which he did, and returned it to the lender in Colorado at which time the lender signed the agreement and mailed the loan proceeds to the defendant in Arizona.

The Arizona Supreme Court concluded the note was made in Colorado and therefore was governed by the laws of Colorado and not usurious.

Here, the note was made in Wisconsin.  Wisconsin law excepts from the usury statute loans to corporations or limited liability companies.  *See* WIS. STAT. § 138.05.  The Court of Appeals for the State of Wisconsin in the case of *Wild Inc. v. Citizens Mort. Inv. Trust*, 290 N.W. 2d, 567, (Wisc. Ct. App. 1980) stated that "Loans to corporations are excepted from the protection of the usury statutes because corporations are less likely to yield to the pressure of necessity and pay unwarranted interest rates" p. 569.  The Wisconsin court further stated that usury statutes are in derogation of the common law.

## PUBLIC POLICY

The interest rate being charged pursuant to Wisconsin law does not violate any fundamental Colorado public policy nor is it so repugnant to prevent its enforcement.  For instance, pawnbrokers can charge a fixed price of 1/5 (20%) of the original price per month or, in essence, 240% per annum.  *See* C.R.S. 29-11.9-101(2).  Also, with respect to Deferred Deposit Loans (i.e., Payday Loans), the lender can charge in essence up to 152% in interest and finance charges.  C.R.C., 5-31-105.  These transactions are not deemed to violate any fundamental Colorado public policy.

## CONCLUSION

Rent-Rite Super Kegs West, Ltd. was not a party to the promissory note, mortgage, deed of trust nor is it a guarantor on the WBL Note.  Rent-Rite Super Kegs West, Ltd. would have had knowledge of the promissory note and deed of trust when it ostensibly purchased the property from Yosemite Management, LLC.  The Complaint in this action does not allege any basis for Colorado law to supersede the parties' choice of law *i.e.,* Wisconsin, nor has there been any allegation that the interest rate of Wisconsin contravenes any strong public policy.

Because the underlying parties had the right of election as to which law should apply and they chose that the laws of Wisconsin would govern the terms of the WBL Note, the Complaint should be dismissed and judgment be entered in favor of the Defendant.

Submitted this 24th day of September, 2018.

WILLIAMS, TURNER & HOLMES, P.C.

/s/ Phillip J. Jones
Phillip J. Jones, #20536

6

Williams, Turner & Holmes, P.C.
744 Horizon Court, Suite 115
Grand Junction, CO  81506
(970) 242-6262; (970) 241-3026 (fax)
pjones@wth-law.com
*Counsel to Defendant*

## CERTIFICATE OF SERVICE

I hereby certify that on this 24th day of September, 2018, a true and correct copy of the **DEFENDANT WORLD BUSINESS LENDERS, LLC'S ARGUMENT AND MEMORANDUM OF LAW** was served on the following via electronic service and/or U.S. Mail, postage prepaid:

Patrick D. Vellone
1600 Stout Street, Suite 1100
Denver, CO  80202

/s/ Phillip J. Jones
Phillip J. Jones,

DocuSign Envelope ID: 776232BE-E5F4-424A-AD9A-32863C674F0D

BLM bank of lake mills



**BUSINESS PROMISSORY NOTE AND SECURITY AGREEMENT**

**BORROWER: CMS Facilities Maintenance, Inc.**

**PRINCIPAL (including processing fees): $550,000.00**

DATE FILED: March 28, 2017 3:41 PM
FILING ID: BB7ABF9CE77EF
CASE NUMBER: 2017CV30714

**DATE: 4/19/2016**

**1. PROMISE TO PAY: CMS Facilities Maintenance, Inc.**("Borrower"), with its principal place of business located at 939 Telluride Street, Aurora, CO 80011, does hereby promise to pay to the order of **BANK OF LAKE MILLS**, its successors and/or assigns ("Lender") at its offices located at 136 E. Madison St., Lake Mills, WI 53551, or at such other location or in such other manner as designated by Lender, the sum of **Five Hundred Fifty Thousand Dollars and Zero Cents ($550,000.00)** ("Principal") plus interest at the weekly interest rate set forth below in Section 2 in accordance with the payment schedule set forth below in Section 3. This Business Promissory Note and Security Agreement ("Loan Agreement") is accepted by Lender in Wisconsin.

**2. INTEREST RATE:** The unpaid Principal shall bear interest at the rate of 0.331123287671% per day until paid in full.

**3. PAYMENT SCHEDULE/APPLICATION OF PAYMENTS:** Borrower shall repay the Principal and interest commencing on 04/25/2016 and on each Business Day thereafter until 04/24/2017 with each daily payment equaling $3,775.72, followed by a final payment of $3,771.34 on 04/25/2017, when any remaining outstanding Principal, interest and other unpaid charges shall be due and payable in full. "Business Day" means any Monday through Friday, except Federal Reserve holidays. The period commencing on 04/25/2016 and ending on 04/25/2017 is referred to as the "Repayment Period."

All payments shall be made by automatic ACH debit from the "Designated Checking Account" set forth in the Business Loan Authorization Agreement for Direct Deposit (ACH Credit) and Direct Payments (ACH Debits) given by Borrower to Lender or pursuant to an alternative payment method prescribed by Lender, and Borrower shall maintain balances in the Designated Checking Account sufficient to make each daily payment due under this Loan Agreement.

Payments shall be applied on the date received first to late charges and other charges due under this Loan Agreement, then to unpaid accrued interest, and then to Principal.

**4. VOLUNTARY PREPAYMENT AND PREPAYMENT PREMIUM:** Borrower has the right to prepay the unpaid Principal in full at any time, but may not make partial prepayments (except as permitted by applicable law). Any such prepayment of the unpaid Principal shall be accompanied by a prepayment premium equal to the greater of (a) fifteen percent (15%) of the amount of the unpaid Principal as of the date of such prepayment or (b) the aggregate amount required to be repaid by Borrower to Lender during the Repayment Period reduced by the sum of (i) the aggregate amount of any payments made by Borrower to Lender pursuant to Section 3 above prior to the date of such prepayment and (ii) the amount of the unpaid Principal as of the date of such prepayment. This prepayment premium is in addition to any and all interest calculated and accrued on the unpaid Principal as of the date of such prepayment in accordance with Section 2 above together with all other amounts then due and payable under this Loan Agreement. No prepayment is permitted unless all outstanding charges are paid in full as of the date of prepayment. If Borrower desires to prepay, Borrower shall forward a written request to WBLPayoff@wbl.com. In addition, Borrower may contact Lender's Servicing Agent at 120 W. 45th St. 29th Floor, New York, NY 10036 or at 212-293-8200 and Lender's Servicing Agent shall provide Borrower with the amount of the unpaid Principal, prepayment premium, and any other amounts due under the terms of the Loan Agreement as of a date designated by Borrower. For the avoidance of doubt, as permitted under applicable law, if the Obligations (as defined below) have been accelerated on the happening of an Event of Default (as defined below), payment of Principal and interest shall be deemed a prepayment for purposes of this Section 4 and shall be accompanied by a prepayment premium.

**5. RETURNED PAYMENT CHARGE:** Borrower will pay a charge of **thirty-five dollars ($35.00)** ("NSF Charge") in connection with any payment by check or electronic transfer that is returned unpaid because of an insufficient balance in the Designated Checking Account or otherwise.

**6. SECURITY INTEREST:** Borrower grants to Lender a security interest in and to any and all property as described below in this Section 6 to secure payment of all debts, obligations and liabilities of Borrower to Lender evidenced by this Loan Agreement or any other loan agreement with Lender ("Obligations"). This is a continuing security interest and will continue in



DocuSign Envelope ID: 775232BE-E5F4-424A-AD9A-32863C674F0D
BLM bank of lake mills

effect even though all or any part of the Obligations is paid in full and even though for a period of time Borrower may not be indebted to Lender. The collateral includes the property purchased with the proceeds of this Loan Agreement described on Schedule A attached to and made a part of this Loan Agreement ("Purchase Money Collateral"), the vehicles and other personal property described on Schedule B attached to and made a part of this Loan Agreement ("Specific Collateral") and all other personal property now owned or hereafter acquired by Borrower (which, along with Purchase Money Collateral and Specific Collateral, is collectively referred to as "Collateral"), including, but not limited to, all goods (except consumer goods), farm products, inventory, equipment, furniture, money, instruments, accounts, accounts receivable, contract rights, documents, chattel paper, general intangibles, including, but not limited to, all products and proceeds of Collateral and all additions and accessions to, replacements of, insurance proceeds of, and documents covering Collateral, all property received wholly or partly in trade or exchange for Collateral, all leases of Collateral and all rents, revenues, issues, profits and proceeds arising from the sale, lease encumbrance, collection, or any other temporary or permanent disposition, of the Collateral or any interest therein. Borrower agrees that Lender may file any financing statement, lien entry form or other document Lender requires in order to perfect, amend or continue Lender's security interest in the Collateral and Borrower agrees to cooperate with Lender as may be necessary to accomplish said filing and to do whatever Lender deems necessary to protect Lender's security interest in the Collateral. Borrower shall ensure that Lender is named as the only lien holder on the titles to the motor vehicles listed on Schedule B to this Loan Agreement as of the date of this Loan Agreement (or the nearest subsequent date as permitted under applicable law).

Borrower shall maintain the Collateral in good condition and repair and not permit its value to be impaired;  keep the Collateral free from all liens, encumbrances and security interests (other than those created or expressly permitted by this Loan Agreement); defend the Collateral against all claims and legal proceedings by persons other than Lender; pay and discharge when due all taxes, license fees, levies and other charges upon the Collateral; not sell, lease or otherwise dispose of the Collateral or permit it to become a fixture or an accession to other goods, except as specifically authorized by Lender in writing; and not permit the Collateral to be used in violation of any applicable law, regulation or policy of insurance.

Borrower shall pay all expenses and, upon request, take any action reasonably deemed advisable by Lender to preserve the Collateral or to establish, determine priority of, perfect, continue perfected, terminate and/or enforce Lender's interest in the Collateral or rights under this Loan Agreement and, further, Borrower authorizes Lender, with full power of substitution, to execute in Borrower's name any documents necessary to perfect, amend or to continue Lender's interest in the Collateral or rights under this Loan Agreement or to demand termination of filings of other secured parties. Lender has no duty to protect, insure or realize upon the Collateral. Loss of or damage to the Collateral shall not release Borrower from any of the Obligations.

## 7. FOR BORROWERS OR COLLATERAL IN LOUISIANA ONLY:

(a)     Foreclosure. In the event that Borrower is domiciled in, or Collateral is located in, Louisiana, on the happening of an Event of Default, Lender shall have the right to commence appropriate foreclosure proceedings against the Collateral and against Borrower.

(b)     Seizure and Sale of Collateral. In the event that Lender elects to commence appropriate Louisiana foreclosure proceedings under the Loan Agreement, Lender may cause the Collateral, or any part or parts thereof, to be immediately seized and sold, whether in term of court or in vacation, under ordinary or executory process, in accordance with applicable Louisiana law, to the highest bidder for cash, with or without appraisement, and without the necessity of making additional demand upon or notifying Borrower or placing Borrower in default, all of which are expressly waived.

(c)     Executory Process. For purposes of foreclosure under Louisiana executory process procedures, Borrower confesses judgment and acknowledges to be indebted to Lender, up to the full amount of the Obligations, in Principal, interest, prepayment charges, NSF Charges, and any other unpaid costs and charges authorized by the Loan Agreement, reasonable attorneys' fees and all costs of collection. Borrower further confesses judgment and acknowledges to be indebted unto and in favor of Lender in the amount of any additional advances that Lender may make on Borrower's behalf pursuant to the Loan Agreement, together with interest thereon. To the extent permitted under applicable Louisiana law, Borrower additionally waives the following: (1) the benefit of appraisal as provided in Articles 2332, 2336, 2723, and 2724 of the Louisiana Code of Civil Procedure, and all other laws with regard to appraisal upon judicial sale; (2) the demand and three (3) days' delay as provided under Articles 2639 and 2721 of the Louisiana Code of Civil Procedure; (3) the notice of seizure as provided under Articles 2293 and 2721 of the Louisiana Code of Civil Procedure; (4) the three (3) days' delay provided under Articles 2331 and 2722 of the Louisiana Code of Civil Procedure; and (5) all other benefits provided under Articles 2331, 2722 and 2723 of the Louisiana Code of Civil Procedure and all other Articles not specifically mentioned above.

DocuSign Envelope ID: 775232BE-E5F4-424A-AD9A-32863C674F0D
BLM bank of lake mills

(d)  **Keeper.** Should any or all of the Collateral be seized as an incident to an action for the recognition or enforcement of this Loan Agreement, by executory process, sequestration, attachment, writ of *fieri facias* or otherwise, Borrower hereby agrees that the court issuing any such order shall, if requested by Lender, appoint Lender, or any agent designated by Lender or any person or entity named by Lender at the time such seizure is requested, or any time thereafter, as "Keeper" of the Collateral as provided under La. R.S. 9:5136, *et seq.* Such a Keeper shall be entitled to reasonable compensation. Borrower agrees to pay the reasonable fees of such Keeper, which compensation to the Keeper shall also be secured by this Loan Agreement.

8.  **REPRESENTATIONS, WARRANTIES, AND COVENANTS:** Borrower makes the following representations, warranties and covenants:

(a)  Borrower is the owner of or is acquiring the Purchase Money Collateral free of all liens, encumbrances and security interests (except Lender's security interest), and is the owner of all other Collateral free of all liens, encumbrances and security interests, except Lender's security interest and any security interests listed on Schedule C attached and made a part of this Loan Agreement;

(b)  **the proceeds of this Loan Agreement will be used for business purposes only, and not for personal, consumer, family or household purposes or to purchase personal, consumer, family or household goods. Borrower understands Lender is relying on the accuracy of this representation in disbursing the loan proceeds and that Borrower's agreement not to use the proceeds of this Loan Agreement for personal, consumer, family or household purposes or to purchase personal, consumer, family or household goods means that certain important duties imposed upon entities making loans for consumer/personal purposes, and certain important rights conferred upon consumers, pursuant to federal or state law will not apply to this Loan Agreement, or any other document or instrument given to Lender in connection with or related to this Loan Agreement. Borrower also understands that Lender will be unable to confirm whether the proceeds of this Loan Agreement will be used for business purposes only. Borrower acknowledges and agrees that a breach by Borrower of the provisions of this subsection 8(b) will not affect Lender's right to (I) enforce Borrower's promise to pay for all amounts owed under this Loan Agreement, regardless of the purpose for which the proceeds of this Loan Agreement are in fact obtained or (II) use any remedy legally available to Lender, even if that remedy would not have been available had the proceeds of this Loan Agreement been used for consumer purposes;**

(c)  the Collateral will be kept at Borrower's address set forth above in Section 1, on Schedule D attached to and made a part of this Loan Agreement;

(d)  Borrower's name in Section 1 above is its exact name on its organizing and/or registered documents, if any, and is Borrower's principal place of business. Borrower shall immediately advise Lender of any change in Borrower's name or address as set forth above in Section 1;

(e)  Borrower is duly organized, validly existing and in good standing under the law of the jurisdiction in which it is organized, and has all licenses and authorizations necessary to carry on its business as now being conducted;

(f)  Borrower has the full power and authority to execute, deliver and perform all transactions contemplated by this Loan Agreement and the performance of and compliance with the terms of this Loan Agreement will not violate the Borrower's organizational documents or constitute a default of any contract, agreement or other instrument to which Borrower is a party;

(g)  Borrower has duly authorized the execution, delivery and performance of this Loan Agreement and has duly executed and delivered this Loan Agreement, and this Loan Agreement constitutes a legal, valid and binding obligation of the Borrower, enforceable against it in accordance with its terms;

(h)  there is no action, suit, proceeding or investigation pending or, to Borrower's knowledge, threatened against or affecting it or any of its assets before or by any court or other governmental authority which, if determined adversely to it, would have a material adverse effect on its financial condition, business or prospects, or the value of the Collateral; and

(i)  Borrower will provide any financial information on request or permit an examination of its books and records to permit Lender to confirm Borrower's ability to pay its Obligations and all other financial obligations.

DocuSign Envelope ID: 775232BE-E5F4-424A-AD9A-32863C674F0D
bank of lake mills

(j) Borrower has not been notified by any of its lenders that it is in default under the terms of any of its credit agreements, nor has Borrower done, caused to be done, or failed to do any act or omission that would result in a default under any credit agreement.

(k) No third party source of financing for Borrower's customers has discontinued, or threatened to discontinue providing financing to Borrower's customers.

9. **DEFAULT**: On the happening of any of the following events (each an "Event of Default"):

(a) failure by Borrower to pay any weekly or other payment required by this Loan Agreement when due;

(b) failure by Borrower to observe, perform, keep or abide by any term, covenant or condition contained in this Loan Agreement or any other document or instrument given to Lender in connection with or related to this Loan Agreement, including any real estate mortgage, security agreement or other agreement or document now or hereafter evidencing or creating any security for the payment of this Loan Agreement;

(c) the filing of a bankruptcy proceeding, assignment for the benefit of creditors, issuance of a judgment execution, garnishment or levy against, or the appointment of a representative of any kind for the commencement of any proceeding for relief from indebtedness by or against Borrower;

(d) the happening of any event, which, in the reasonable judgment of Lender, adversely affects Borrower's ability or the ability of any guarantor of Borrower's Obligations under this Loan Agreement ("Guarantor") to repay Borrower's Obligations, or materially affects the value of the Collateral;

(e) any written representation, statement or warranty made to Lender by Borrower or any Guarantor is untrue or is breached;

(f) the occurrence of (I) a default under any guaranty of Borrower's Obligations ("Guaranty"), or any other document or instrument given to Lender in connection with or related to this Loan Agreement, or (II) an event of default under any other loan agreement that Borrower may have with any other lender;

(g) any Guaranty is revoked or becomes unenforceable for any reason;

(h) Lender, upon examination of Borrower's financial information during the term of this Loan Agreement, becomes insecure in Borrower's ability to pay the Obligations,

Lender, at its option, without notice or demand (except as required by applicable law), may (A) declare the entire unpaid balance of all Obligations under this Loan Agreement or other agreements immediately due and payable, and shall have the right to proceed to collect such Obligations under applicable law and enforce its rights under any Guaranty; and (B) proceed against the Collateral and any other collateral securing any obligation to Lender as if said collateral secured the Obligations, as permitted under the applicable Uniform Commercial Code or any other applicable law. As permitted under the Uniform Commercial Code, Lender may take possession of Collateral without notice or hearing, which Borrower waives, and upon demand, Borrower shall assemble the Collateral and make it available to Lender at any convenient place designated by Lender. Lender's receipt of any payment after the occurrence of an Event of Default, whether or not the Obligations have been accelerated, shall not constitute a waiver of the default or of Lender's rights or remedies upon such default, including Lender's right to accelerate the unpaid balance of the Obligations and pursue collection thereof. Election by Lender to pursue or waive any remedy shall not exclude pursuit of any other remedy.

10. **INSPECTION OF COLLATERAL AND PLACE OF BUSINESS**: Lender and Lender's representatives and agents shall have the right at any reasonable time or times to inspect the Collateral wherever located and the interior and exterior of any Borrower place of business, and Borrower shall assist Lender and its representatives and agents in making any such inspection. During an inspection of any Borrower place of business, Lender or Lender's representatives and agents may examine, among other things, whether Borrower (i) has a place of business that is separate from any personal residence, (ii) is open for business, (iii) has sufficient inventory and/or staff to conduct Borrower's business and (iv) has one or more credit card terminals or point of sale systems if Borrower processes credit card transactions. When performing an inspection, Lender or Lender's representatives and agents may photograph the interior and exterior of any Borrower place of business, including any signage. Any photograph will become and remain the sole property of Lender and will be shared with Lender's employees, representatives and agents. Borrower grants Lender the irrevocable and permanent right to display and

DocuSign Envelope ID: 775232BE-E5F4-424A-AD9A-32863C674F0D

BLM   bank of lake mills

share any photograph in all forms, including composite and modified representations, for all purposes, with Lender's employees, representatives and agents. Borrower agrees to reimburse Lender for the cost of the inspections described in this Section 10.

**11. EVALUATION OF CREDIT**: Borrower authorizes Lender to obtain business and personal credit bureau reports in Borrower's name, at any time and from time to time for purposes of deciding whether to approve the requested business loan or for any update, renewal, extension of credit or other lawful purpose. Upon Borrower's request, Lender will advise Borrower if Lender obtained a credit report and Lender will give Borrower the credit bureau's name and address. Borrower agrees to submit current financial information, a new credit application, or both, in Borrower's name at any time promptly upon Lender's request.

**12. ATTORNEYS' FEES, COLLECTION COSTS AND POST-JUDGMENT RATE OF INTEREST**: In the event Lender retains counsel with respect to enforcement of its rights under this Loan Agreement or any other document or instrument given to Lender, Borrower agrees to pay all expenses of Lender in enforcing its rights to collect the Obligations or in taking possession, holding, preparing for disposition, and disposing of the Collateral, including Lender's reasonable attorneys' fees (whether or not an action is commenced and whether or not in the court of original jurisdiction, appellate court, bankruptcy court or otherwise) and all costs of collection of any judgment and any costs of appeal. In the event this Loan Agreement is brought to a judgment, interest shall accrue at the interest rate set forth in Section 2 above until the judgment is satisfied, except as prohibited by applicable law.

**13. SALE OF LOAN AGREEMENT**: This Loan Agreement, or an interest in this Loan Agreement, together with the rights to the Collateral, may be sold, assigned, transferred or conveyed by Lender one or more times.

**14. INDEMNIFICATION**: Except for Lender's willful misconduct, Borrower will indemnify and save Lender harmless from all loss, costs, damage, liability or expenses (including, without limitation, court costs and reasonable attorneys' fees) that Lender may sustain or incur by reason of defending or protecting Lender's security interest or the priority thereof or enforcing its rights to collect the Obligations, or in the prosecution or defense of any action or proceeding concerning any matter growing out of or in connection with this Loan Agreement and/or any other documents or instruments now or hereafter executed in connection with this Loan Agreement and/or the Obligations and/or the Collateral. This indemnity shall survive the repayment of the Obligations and the termination of this Loan Agreement.

**15. MISCELLANEOUS**:

   (a) Delay or failure of Lender to exercise any of its rights under this Loan Agreement shall not be deemed a waiver thereof. No waiver of any condition or requirement shall operate as a waiver of any other or subsequent condition or requirement.

   (b) This Loan Agreement may not be modified orally, and may be modified only upon written agreement signed by Lender.

   (c) Lender is an FDIC insured, Wisconsin state chartered bank and this Loan Agreement is accepted by Lender in Wisconsin. CONSEQUENTLY, THIS AGREEMENT WILL BE GOVERNED BY FEDERAL LAW APPLICABLE TO AN FDIC INSURED INSTITUTION AND TO THE EXTENT NOT PREEMPTED BY FEDERAL LAW, THE LAWS OF THE STATE OF WISCONSIN WITHOUT REGARD TO CONFLICT OF LAW RULES. The legality, enforceability and interpretation of this Agreement and the amounts contracted for, charged and reserved under this Loan Agreement will be governed by such laws.

   (d) Borrower and Lender agree that any action or proceeding to enforce any rights or obligations arising out of this Loan Agreement shall be commenced either in Wisconsin, New York or the state (or commonwealth, as the case may be) of Borrower's address set forth in Section 1 above ("Borrower's State") and Borrower waives personal service of process and agrees that a summons and complaint commencing an action or proceeding in any such court shall be properly served and confer personal jurisdiction if served by registered or certified mail to Borrower at the address specified by Borrower above in Section 1, or as otherwise provided by the laws of the State of Wisconsin, the State of New York, the Borrower's State, or the United States of America. Borrower and Lender agree that venue is proper in such courts.

   (e) Without affecting the liability of Borrower or any Guarantor, Lender may accept partial payments marked "in full" or otherwise, release or impair any Collateral or agree not to sue any party liable on this Loan Agreement without waiving any of its rights hereunder.

DocuSign Envelope ID: 775232BE-E5F4-424A-AD9A-32863C674F0D
BLM bank of lake mills

(f) Presentment, protest, demand and notice of dishonor are waived.

(g) Without affecting the liability of any Guarantor, Lender may from time to time, without notice, renew or extend the time for payment.

(h) Borrower expressly agrees that the interest rate set forth above in Section 2 is appropriate under the circumstances and shall be the applicable rate at which unpaid Principal (and Costs, as defined below) shall bear interest under this Loan Agreement, notwithstanding any rate of interest prescribed by statute from time to time; provided, however, if fulfillment of any provisions of this Loan Agreement or any other instrument securing the Obligations is subject to a law that sets maximum interest rates or other charges, and that law is finally interpreted so that the interest or other fees collected or to be collected in connection with this Loan Agreement exceed the permitted limits, then (I) any such charge will be reduced by the amount necessary to reduce the charge to the permitted limit and (II) any sums already collected from Borrower that exceed the permitted limits will be refunded or credited to Borrower and the obligations created by this Loan Agreement shall be fulfilled to the limit of such validity as is permitted by law.

(i) Borrower shall keep the Collateral and Lender's interest in it insured under policies with such provisions, for such amounts and by such insurers as shall be satisfactory to Lender from time to time, and shall furnish evidence of such insurance satisfactory to Lender upon request. Borrower assigns (and directs any insurer to pay) to Lender the proceeds of all such insurance and any premium refund and authorizes Lender to endorse in the name of Borrower any instrument for such proceeds or refunds and, at the option of Lender, to apply such proceeds and refunds to any unpaid balance of the Obligations, whether or not due, and/or to restoration of the Collateral, returning any excess to Borrower. Lender is authorized, in the name of Borrower or otherwise, to make, adjust and/or settle claims under any insurance on the Collateral, or cancel the same after the occurrence of an Event of Default.

(j) If Borrower fails to perform any of Borrower's duties set forth in this Loan Agreement or in any evidence of or document relating to the Obligations, Lender is authorized, in Borrower's name or otherwise, to take any such action, including, without limitation, signing Borrower's name or paying any amount so required, and the cost ("Cost") shall be one of the Obligations secured by this Loan Agreement and shall be payable by Borrower upon Lender's demand with interest at the interest rate set forth above in Section 2 from the date of payment by Lender.

(k) Borrower releases Lender from any liability for any act or omission relating to the Obligations, the Collateral or this Loan Agreement, except Lender's willful misconduct.

(l) Invalidity or unenforceability of any provision of this Loan Agreement shall not affect the validity or enforceability of any other provision.

(m) The terms of this Loan Agreement shall be binding upon Borrower and its permitted successors and assigns, and shall inure to the benefit of Lender and its successors and assigns.

(n) Borrower acknowledges that a broker may have received compensation in connection with this Loan Agreement.

(o) Any of the Borrower, Lender or a Guarantor may choose to arbitrate any or all disputes and claims arising out of or relating to this Loan Agreement, the Guaranty or any other related document. A claim includes matters arising as an initial claim, counter-claim, cross-claim, third-party claim, or otherwise. If the Borrower, Lender or a Guarantor chooses to litigate any dispute or claim arising out of or relating to this Loan Agreement, the Guaranty or any related document through a judicial action, the decision to litigate shall not be deemed a waiver of arbitration, and if such judicial action is contested, any party may thereafter invoke its arbitration rights at any time before any discovery is taken in the judicial action. If the Borrower, Lender or a Guarantor seeks to have a dispute resolved by arbitration, that party must first send to the other party(ies) by certified mail, a written Notice of Intent to Arbitrate. If Borrower, Lender or a Guarantor do not reach an agreement to resolve the claim within 10 days after the Notice is received, any party may commence an arbitration proceeding with the American Arbitration Association ("AAA"). Lender will promptly reimburse Borrower or the Guarantor any arbitration filing fee, however, in the event that both the Borrower and the Guarantor must pay arbitration filing fees, Lender will only reimburse the Borrower's arbitration filing fee and, except as provided in the next sentence, the Lender will pay all arbitration administration and arbitrator fees. If the arbitrator finds that either the substance of any claim raised by Borrower or a Guarantor or the relief sought by Borrower or a Guarantor is improper or not warranted, as measured by the standards set forth in Federal Rule of

DocuSign Envelope ID: 775232BE-E5F4-424A-AD9A-32863C874F0D
BLM  bank of lake mills

Procedure 11(b), then Lender will pay the administration or arbitrator fees only if required by the AAA Rules. If the arbitrator grants relief to the Borrower or a Guarantor that is equal to or greater than the value of the relief requested by the Borrower or a Guarantor in the arbitration, Lender shall reimburse Borrower or the Guarantor, as applicable, for that party's reasonable attorneys' fees and expenses incurred for the arbitration. BORROWER AND LENDER AGREE THAT BY ENTERING INTO THIS LOAN AGREEMENT, EACH IS WAIVING THE RIGHT TO TRIAL BY JURY. BORROWER AND LENDER MAY BRING CLAIMS AGAINST ANY OTHER PARTY ONLY IN THEIR INDIVIDUAL CAPACITY AND NOT AS A PLAINTIFF REPRESENTATIVE OR CLASS MEMBER IN ANY PURPORTED REPRESENTATIVE OR CLASS PROCEEDING. Further, Borrower and Lender agree that the arbitrator may not consolidate proceedings for more than one person's claims, and may not otherwise preside over any form of a representative or class proceeding, and if this specific provision is found unenforceable, then the entirety of this arbitration clause shall be null and void. Any award by the individual arbitrator shall be final and binding, except for any appeal right under the Federal Arbitration Act ("FAA"), and may be entered and enforceable as a judgment in any court of competent jurisdiction, including as a judgment that permits Lender to initiate or complete the exercise of its remedies against, or its realization or foreclosure upon, any collateral or security provided for the benefit of Lender. This arbitration provision is made pursuant to a transaction in interstate commerce, and shall be governed by the Federal Arbitration Act at 9 U.S.C. Section 1.

(p)  In order to ensure a high quality of service for Lender's customers, Lender may monitor and/or record telephone calls between Borrower and Lender's employees. Borrower acknowledges that Lender may do so and agrees in advance to any such monitoring or recording of telephone calls.

(q)  Borrower authorizes Lender and Lender's affiliates, agents and independent contractors to contact Borrower at any telephone number Borrower provides to Lender or from which Borrower places a call to Lender, or any telephone number where Lender believes it may reach Borrower, using any means of communication, including, but not limited to, calls or text messages to mobile, cellular, wireless or similar devices or calls or text messages using an automated telephone dialing system and/or artificial voices or prerecorded messages, even if Borrower incurs charges for receiving such communications. Lender and Lender's affiliates, agents and independent contractors, may use any other medium not prohibited by law, including, but not limited to, mail, e-mail and facsimile, to contact Borrower. Borrower expressly consents to conduct business by electronic means.

(r)  TO THE EXTENT NOT PROHIBITED BY APPLICABLE LAW, BORROWER AND LENDER WAIVE THEIR RIGHT TO A TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION BASED UPON, ARISING OUT OF OR RELATED TO THIS LOAN AGREEMENT AND ALL OTHER DOCUMENTATION EVIDENCING THE OBLIGATIONS, IN ANY LEGAL ACTION OR PROCEEDING.

(s)  This Loan Agreement may be executed in one or more counterparts, each of which counterparts shall be deemed to be an original, and all such counterparts shall constitute one and the same instrument. For purposes of the execution of this Loan Agreement, electronic or fax signatures shall be treated in all respects as original signatures.

**PRIOR TO SIGNING THIS LOAN AGREEMENT, BORROWER READ AND UNDERSTOOD ALL OF THE PROVISIONS OF THIS LOAN AGREEMENT. AFTER DUE CONSIDERATION, AND THE OPPORTUNITY TO CONSULT WITH OTHER LENDERS AND AN ATTORNEY, ACCOUNTANT OR OTHER COMPETENT PROFESSIONAL OF ITS CHOICE, BORROWER KNOWINGLY, WILLFULLY AND VOLUNTARILY AGREES TO THE TERMS OF THIS LOAN AGREEMENT.**

**BORROWER ACKNOWLEDGES RECEIPT OF A FULLY COMPLETED AND EXECUTED VERSION OF THIS LOAN AGREEMENT.**

BORROWER: CMS Facilities Maintenance, Inc.

By: *Craig Harold Heber*
DocuSigned by:
D0339B3344B347C...

Printed Name: Craig Harold Heber

Title: owner

DocuSign Envelope ID: 775232BE-E5F4-424A-AD9A-32863C674F0D
BLM   bank of lake mills

## ACKNOWLEDGMENT

STATE/COMMONWEALTH OF CO      )

                             )    ss.:

COUNTY OF _____        )

On the_____ day of _____, in the year ____ before me, the undersigned, a notary public in and for said State/Commonwealth, personally appeared _____Craig Harold Heber_____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within Business Promissory Note and Security Agreement and acknowledged to me that she/he executed the same in her/his capacity as_____ of_____, and that by her/his signature on the Business Promissory Note and Security Agreement, the individual, or the person upon behalf of which the individual acted, executed the Business Promissory Note and Security Agreement.


_____
Notary Public
My Commission expires:

DocuSign Envelope ID: 775232BE-E5F4-424A-AD9A-32863C674F0D
BLM   bank of lake mills

# SCHEDULE A

## NONE

DocuSign Envelope ID: 775232BE-E5F4-424A-AD9A-32863C674F0D
BLM ▲ bank of lake mills

## SCHEDULE B

## NONE

DocuSign Envelope ID: 775232BE-E5F4-424A-AD9A-32863C674F0D

BLM  bank of lake mills

# SCHEDULE C – PURCHASE MONEY COLLATERAL

NONE

DocuSign Envelope ID: 775232BE-E5F4-424A-AD9A-32863C674F0D

BLM bank of lake mills

## SCHEDULE D

### ADDRESS OTHER THAN BORROWER'S ADDRESS AT WHICH COLLATERAL IS KEPT

1400 YOSEMITE DRIVE, DENVER, CO 80220