## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLORADO
Bankruptcy Judge Thomas B. McNamara

| | |
|---|---|
| In re: | |
| RENT-RITE SUPERKEGS WEST, LTD., | Bankruptcy Case No. 16-10407 TBM<br>Chapter 7 |
| Debtors. | |
| RENT-RITE SUPERKEGS WEST, LTD., | |
| Plaintiff, | |
| v. | Adv. Pro. No. 18-1099 TBM |
| WORLD BUSINESS LENDERS, LLC, | |
| Defendant. | |

---

## MEMORANDUM OPINION AND ORDER DENYING ALL CLAIMS

---

### I.   Introduction.

Interest is the lubricant that keeps the machinery of the United States' financial markets humming.  No bank wants to lend its money without some return on its capital.  And no borrower expects to receive free funding from its lender.  But what about 120.86% interest per year?  It's hard to believe that the management of any legitimate United States company would ever agree to pay such an ultra-high rate of interest.  It makes no sense.  Even a fifth-grader taking an introduction to economics class should know better.  But that is what happened in this crazy case.

Bank of Lake Mills, a Wisconsin state chartered bank, agreed to loan $550,000 to CMS Facilities Maintenance, Inc. ("CMS"), a Colorado-based corporation.  CMS executed a Promissory Note promising to repay the balance in Wisconsin within a year.  There was a catch:  the borrowing came at a significant price.  CMS had to pay interest on the loan at the rate of 120.86% per year.  The Parties agreed that federal law and Wisconsin law (if not preempted) would govern the validity of the Promissory Note.  Federal interstate interest law generally is based on the contract, the location of the state chartered bank, and the place of payment.  Wisconsin permits corporations to agree to any interest rate.  In the Badger State, there is no such thing as corporate

1

usury.

Although the reasons are a mystery, another company, Yosemite Management, LLC ("Yosemite Management"), stepped in and pledged some of its Colorado real estate as security for CMS' obligation to Bank of Lake Mills under a Deed of Trust. Later, Bank of Lake Mills assigned its rights under the Promissory Note to Defendant, World Business Lenders, LLC (the "Lender"). Later still, Yosemite Management sold the encumbered real estate to the Debtor/Plaintiff, Rent-Rite Superkegs West., Ltd. (the "Debtor"). The two companies have common management.

When the Debtor acquired the real estate, it knew about the Deed of Trust, knew that CMS' obligation to Bank of Lake Mills was in default, and knew that the obligation bore interest at an extraordinarily high rate. All of this might have suggested that it would be very unwise to buy the real estate. However, the Debtor went through with the acquisition anyway. Perhaps, not surprisingly, given the quality of its decision-making, the Debtor later declared bankruptcy.

Thereafter, the Debtor sued the Lender and asserted three causes of action: declaratory judgment under Fed. R. Bankr. P. 7001(9); claim disallowance under Sections 502 of the Bankruptcy Code; and equitable subordination under Section 510 of the Bankruptcy Code.[1] The central thrust of the Debtor's Complaint is that the Promissory Note is usurious and, therefore, invalid. Even though the parties to the Promissory Note agreed to federal law and Wisconsin law (if not preempted), the Debtor contends that the Promissory Note should be governed by Colorado law. Colorado law prohibits interest rates above 45% per annum.

It all comes down to the applicable law. If federal law or Wisconsin law governs the Promissory Note, the Lender prevails. On the other hand, if Colorado law governs the Promissory Note, the Debtor wins. This sounds simple. But it is not. The dispute requires the Court to engage in a very complex and difficult choice of law analysis to determine the applicable substantive law. After evaluating various choice of law approaches, the Court ultimately concludes that all paths favor the Lender. The ultra-high interest rate contained in the Promissory Note is permissible under federal law and Wisconsin law. Pleas for fairness and equity cannot rescue the Debtor from the governing law, or its misguided decision-making.

## II.   Jurisdiction and Venue

The Court has jurisdiction to enter final judgment on all of the issues presented in this Adversary Proceeding pursuant to 28 U.S.C. § 1334. The claims and defenses are core proceedings under 28 U.S.C. §§ 157(b)(2)(A) (matters concerning administration of the bankruptcy estate); (b)(2)(B) (allowance or disallowance of claims against the estate); (b)(2)(C) (counterclaims by the estate against persons filing claims against the

---

[1]   All references to the "Bankruptcy Code" are to the United States Bankruptcy Code, 11 U.S.C. § 101 *et seq.* Unless otherwise indicated, all references to "Section" are to section of the Bankruptcy Code.

estate); and (b)(2)(O) (other proceedings adjusting the debtor-creditor relationship).[2] Both the Debtor and the Lender consented to the Court's exercise of jurisdiction over this Adversary Proceeding and the entry of final judgment on all claims and defenses. Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## III.    Procedural History

On December 11, 2017, the Debtor filed for relief under Chapter 11 of the Bankruptcy Code.[3] A few months later, the Debtor commenced this Adversary Proceeding against the Lender by filing an "Adversary Complaint." (Docket No. 1, the "Complaint.")[4] Thereafter, the Lender submitted its "Answer," denying the Debtor's claims. (Docket No. 6, the "Answer.")

As the impending trial date loomed near, the parties filed a "Joint Motion to Continue Trial" (Docket No. 27, the "Motion to Continue"), in which they requested that the Court vacate the trial set for September 11, 2018, establish a schedule for the submission of a statement of undisputed legal facts and legal briefs, and reset the trial for a later date. In the Motion to Continue, the parties seemed to contend, on the one hand, that the Court should decide the legal issues in the case without trial because the "facts of this case are largely uncontested," but also seemed to contend, on the other hand, that the Court might still need to hold a trial on a later date. The Court conducted a hearing on the Motion to Continue. After listening to the parties' positions, the Court denied the Motion to Continue without prejudice. (Docket No. 31.)

Later, the parties filed a "Joint Motion to Vacate Trial." (Docket No. 30, the "Motion to Vacate.") In the Joint Motion to Vacate, the parties stated: "[T]he facts of the case are largely uncontested. It is the parties' position that a determination by the Court on the legal principles at issue in the case would resolve the matter without the need for trial." Accordingly, the parties submitted "Amended Stipulated Facts" (Docket No. 30-1, the "Stipulated Facts") and "Amended Stipulated Exhibits" (Docket No. 30-2) consisting of Exhibit Nos. 1-8, B, C, D, and H (the "Exhibits"). The parties also proposed that they be permitted to submit "written closing arguments" in lieu of trial.

Consistent with the parties' requests, the Court entered an "Order Re: Joint Motion to Vacate Trial" (Docket No. 32), vacating the trial and stating:

> Submission of Amended Stipulated Facts and Amended Exhibits. The Amended Stipulated Facts (Docket No. 30-1)

---

[2]    The Debtor asserts that the Court also has jurisdiction pursuant to 28 U.S.C. § 157(b)(2)(F) (proceedings to determine, avoid, or recover preferences). However, the Court finds that 28 U.S.C. § 157(b)(2)(F) does not apply because the Debtor is not asserting a preference claim against the Lender under 11 U.S.C. § 547.

[3]    Docket No. 1 in *In re Rent-Rite Superkegs West, Ltd.*, Case No. 17-21236 TBM (Bankr. D. Colo.).

[4]    The Court will refer to particular documents contained in the CM/ECF docket for this Adversary proceeding using the convention: "Docket No. ___."

and Amended Stipulated Exhibits (Docket No. 30-2 )
submitted by the parties (along with copies of the exhibits
hand-delivered to chambers) shall constitute the only
evidence upon which the parties shall rely in submission of
written arguments, and shall constitute the only evidence for
the Court to consider in determining the claims in the
Plaintiff's Adversary Complaint.

Further, the Court directed the parties to submit their "written closing arguments."

Subsequently, the Debtor filed its "Final Written Arguments" (Docket No. 36) and
the Lender submitted its "Argument and Memorandum of Law" (Docket No. 35)
(together, the "Closing Arguments"). Both Closing Arguments focused on the applicable
choice of law and appeared to suggest that the Court should apply Colorado choice of
law principles based upon Colorado case law and Section 187 of the Restatement
(Second) of Conflicts of Laws ("Restatement Section 187"). Having reviewed the
Closing Arguments, the Court determined that neither of the parties addressed certain
critical legal issues. Accordingly, the Court ordered the Parties to provide supplemental
legal briefs. (Docket No. 37, the "Order for Additional Briefing.") Both Parties complied
and submitted supplemental legal briefs. (Docket Nos. 39, 40, 41, and 42, the
"Supplemental Legal Briefs".) Thus, all of the claims and defenses in the Adversary
Proceeding are fully submitted and ripe for decision.

## IV.    Findings of Fact.

Based upon the Stipulated Facts and Exhibits, the Court makes the following
findings of fact:

## A.    The Promissory Note, Deed of Trust, and Assignment.

On April 19, 2016, CMS executed a "Business Promissory Note and Security
Agreement" (Ex. 1, the "Promissory Note") in favor of Bank of Lake Mills in the original
principal amount of $550,000.[5] CMS' "principal place of business" was listed as "939
Telluride Street, Aurora, CO," while Bank of Lake Mills was identified as an "FDIC
insured, Wisconsin state chartered bank" located at "136 E. Madison St., Lake Mills,
WI."[6] The Promissory Note states that it "is accepted by [Bank of Lake Mills] in
Wisconsin." *Id.*

CMS agreed to pay "Bank of Lake Mills, its successors and/or assigns" the
principal amount of $550,000 plus interest at the Wisconsin offices of Bank of Lake
Mills, "or at such other location or in such manner as designated by [Bank of Lake

---

[5]      In their Stipulated Facts, the parties agreed that the Promissory Note was in the principal amount
of $555,000 — not $550,000. Stip. Fact No. 2. However, the face of the Promissory Note states that the
principal amount is $550,000. Ex. 1. The Court surmises that the Stipulated Facts are wrong on this
issue. However, the discrepancy is not material.

[6]      Ex. 1 ¶ 1.

4

Mills]."[7]  The amounts due under the Promissory Note bore interest at a remarkably high rate:  "0.331123287671% per day until paid in full."  That rate equals 120.86% per annum.  CMS agreed to pay principal and interest in the daily amount of $3,775.72 starting April 25, 2016, and continuing for one year until the Promissory Note matured on April 24, 2017.[8]  Further, CMS contracted to make the daily payments to Bank of Lake Mills by "automatic ACH debit" from a "Designated Checking Account."[9]  In the event of default by CMS, the Promissory Note provided for CMS to also pay Bank of Lake Mill's costs of collection, including attorneys' fees.[10]

The Promissory Note contains a detailed choice of law provision:

> Lender [Bank of Lake Mills] is an FDIC insured, Wisconsin state chartered bank and this Loan Agreement is accepted by [Bank of Lake Mills] in Wisconsin.  CONSEQUENTLY, THIS AGREEMENT WILL BE GOVERNED BY FEDERAL LAW APPLICABLE TO AN FDIC INSURED INSTITUTION AND TO THE EXTENT NOT PREEMPTED BY FEDERAL LAW, THE LAWS OF THE STATE OF WISCONSIN WITHOUT REGARD TO CONFLICT OF LAW RULES.  The legality, enforceability and interpretation of this Agreement and the amounts contracted for, charged and served under this Loan Agreement will be governed by such laws.[11]

To secure its obligations under the Promissory Note, CMS granted Bank of Lake Mills a blanket security interest in personal property including "all goods (except consumer goods), farm products, inventory, equipment, furniture, money, instruments, accounts, accounts receivable, contract rights, documents, chattel paper, general intangibles [and] products and proceeds . . . ."[12]

As additional security for the obligations under the Promissory Note, a separate business entity, Yosemite Management, executed a "Deed of Trust" (Ex. 2, the "Deed of Trust"), dated April 21, 2016, in favor of Bank of Lake Mills.  As discussed later, the Deed of Trust transaction, which was not conducted at arms-length, seems highly peculiar and ill-advised.

---

[7]   *Id.*

[8]   The final daily payment scheduled for April 25, 2017 was a slightly lower amount:  $3,771.34.  Ex. 1 ¶¶ 2-3; Stip. Fact No. 4.  The daily payments were required only on "Business Days."

[9]   Ex. 1 ¶ 3.  The parties did not provide the Court with any Stipulated Facts concerning the "Designated Checking Account" or the mechanics of the "automatic ACH debit" process.

[10]   Ex. 1 ¶ 12.

[11]   Ex. 1 ¶ 15(c) (emphasis in original).

[12]   Ex. 1 ¶ 6.  The Promissory Note refers to "property purchased with the proceeds of this Loan Agreement described on <u>Schedule A</u> . . . and other personal property described on <u>Schedule B</u> . . . ."  However, the Promissory Note admitted into evidence has no schedules.  Thus, the Court cannot identify any specific collateral.

In any event, the Deed of Trust expressly grants Bank of Lake Mills a security interest in certain Colorado real property and improvements (the "Property"):[13]

> LOTS 8 THROUGH 31, BLOCK 1, COLFAX SQUARE, AND THE VACATED WEST 10 FEET OF AKRON STREET ADJACENT THERETO, VESTED IN THE OWNER OF SAID LOTS 8 THROUGH 31 BY VIRTUE OF ORDINANCE NO. 61-4 OF THE CITY OF AURORA RECORDED JANUARY 24, 1964 IN BOOK 1492 AT PAGE 240, COUNTY OF ARAPAHOE, STATE OF COLORADO.
>
> . . .
>
> Commonly known as 1400 Yosemite Street, Denver, CO 80220.

The Property was pledged as security for the "repayment of" the Promissory Note including "performance" of CMS' obligations under the Promissory Note.[14]  The Deed of Trust specifically identifies and describes the Promissory Note executed by CMS, including the date, the original principal amount, the payment terms, and the maturity date.[15]  Notably, the Deed of Trust also identifies the extraordinarily high per annum interest rate charged on the Promissory Note.[16]  So, Yosemite Management was fully aware that it was pledging its own Property to secure repayment of an ultra-high interest rate obligation.

Typical of such liens, the Deed of Trust required that the Property be preserved, maintained, and insured.[17]  And, consistent with the main purpose of a mortgage, the Deed of Trust spelled-out rights upon default under the Promissory Note, including foreclosure of the Property.[18]  Finally, the Deed of Trust contains its own choice of law provision, which is different than the provision in the Promissory Note:

> This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located.  All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law.  Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract.[19]

---

[13]  Stip. Fact No. 3; Ex. 2 at Ex. A.
[14]  Ex. 2 at 3.
[15]  Ex. 2 at 1 (definition of "Note").
[16]  *Id.*
[17]  *Id.* at 6-9.
[18]  *Id.* at 14-15.
[19]  Ex. 2 ¶ 16.

Just a few months after the Promissory Note and Deed of Trust were executed, on June 13, 2016, Bank of Lake Mills assigned the Promissory Note and the Deed of Trust to the Lender (World Business Lenders, LLC).[20]  The Lender is "a New York limited liability company with its principal place of business at 101 Hudson Street, 33rd Floor, Jersey City, NJ."[21]

## B.  <u>The Debtor's Purchase of the Property</u>.

On December 4, 2017, Yosemite Management entered into a "Purchase and Sale Agreement" with the Debtor.[22]  Yosemite Management, as owner of the Property, agreed to sell the Property to the Debtor for a purchase price of $2,750,000.[23]  However, the Property was already encumbered by the Deed of Trust securing payment of the Promissory Note by CMS.  Accordingly, the Debtor took a credit against the purchase price for amount of the outstanding obligation on the Promissory Note as well another secured debt.  The Purchase and Sale Agreement provided, in relevant part:

> 3.  Payment Terms. The Purchase Price shall be paid as follows:
>
> A.  Credit for balance owed on Bank of Mills Deed of Trust. *Purchaser shall take title to the Property subject to the lien of the of the [sic] deed of trust encumbering the Property and securing a note made by CMS Facilities Maintenance Inc. payable to Bank of Lake Mills in the original principal amount of $550,000.00 recorded on April 26, 2016 at Reception No. 6042826 of the real property records of Arapahoe County, Colorado (the "Bank of Lake Mills Deed of Trust").* Purchaser is not assuming any personal liability on the obligations secured by the Bank of Lake Mills Deed of Trust but shall receive a credit against the Purchase Price of the amount outstanding on those obligations as of the date of the Closing[.][24]

The result of the foregoing was that the Debtor effectively received a purchase price discount based on the amount of debt secured by the Property.

A few days later, on December 6, 2017, the Debtor executed a promissory note in the original principal amount of $1,963,106, plus interest at an annual rate of 6%, in

---

[20]     Stip. Fact No. 5; Ex. 3.  The "Assignment of Deed of Trust" was presented as Ex. 3 and is unsigned; however, the Parties stipulated that the Bank of Lake Mills assigned Promissory Note and Deed of Trust to the Lender.
[21]     Stip. Fact No. 1.
[22]     Stip. Fact No. 7; Ex. 4.
[23]     Ex. 4 ¶ 1.
[24]     Ex. 4 ¶ 3 (emphasis added).

favor of Yosemite Management.[25]  Then, Yosemite Management transferred the Property to the Debtor by "Special Warranty Deed,"[26] which expressly disclosed the Deed of Trust encumbering the Property (as well as another lien).  Finally, to secure the Debtor's new obligation to Yosemite Management, the Debtor placed another deed of trust on the Property for the benefit of Yosemite Management.[27]  The new deed of trust recognized the priority of the Deed of Trust granted to Bank of Lake Mills.[28]  Thus, the Debtor is the current owner of the Property, subject to three deeds of trust.

Notably, the transactions surrounding the Debtor's purchase of the Property were not at arm's length.  Thomas S. Wright signed the Purchase and Sale Agreement as both the Manager of Yosemite Management and the President of the Debtor.  He also signed the new promissory note and deed of trust as President of the Debtor and for the benefit of Yosemite Management.  So, it was very much an inside deal.  And, the Debtor was quite aware that the Promissory Note and Deed of Trust encumbered the Property since, among other things, the Debtor's principal executed the Deed of Trust as a Member of Yosemite Management.  The Parties did not provide the Court with any evidence concerning the relationship between the Debtor and Yosemite Management.  The Court has no idea why the Debtor would purchase the Property knowing that it was encumbered by the Deed of Trust securing payment of the Promissory Note bearing stupendously high interest in excess of 120% per annum.  The transaction seems extraordinarily bizarre and ill-advised.

## C.    The Default and Proof of Claim.

CMS made regular daily payments on the Promissory Note from April 26, 2016, through approximately October 2016.[29]  Thereafter, CMS incurred "NSF Fees," and its payment history became somewhat spottier throughout the balance of 2016 and early 2017.[30]  CMS stopped paying altogether after February 15, 2017.[31]  So, even before the Debtor purchased the Property from Yosemite Management (subject to the Deed of Trust), the Promissory Note had been in default for almost a year.  The Debtor knew of the default because it received a purchase price discount and credit for the amount owed on the Promissory Note.

After the Debtor filed for bankruptcy, the Lender submitted a "Proof of Claim" (Claim No. 27, the "Proof of Claim").[32]  As support for the Proof of Claim, the Lender attached the Promissory Note and Deed of Trust.  The Lender stated the amount owed as of the bankruptcy was $658,652.95, along with interest at the rate of 120.86% per annum.[33]  Further, the Lender asserted that the Proof of Claim was secured by the

---

[25]    Stip. Fact No. 8; Ex. 5.
[26]    Stip. Fact No. 6; Ex. 7.
[27]    Ex. 6.
[28]    Ex. 6 ¶ 3.
[29]    Ex. H.
[30]    *Id.*
[31]    *Id.*
[32]    Ex. 8; Stip. Fact No. 11.
[33]    *Id.*

Property.[34]  Since the Debtor is not the obligor on the Promissory Note, the Lender's Proof of Claim sounds *in rem* in relation to the Property.[35]  That is, the Debtor is not directly responsible for payment of the Promissory Note but the Property owned by the Debtor is encumbered by the Deed of Trust securing payment of the Promissory Note.

## V.   The Parties' Positions.

### A.   The Complaint and the Answer.

The Debtor's Complaint frames the dispute.   The Debtor asserted three related causes of action.  In the First Claim for Relief, the Debtor sought a declaration that "the interest charged under [the Promissory Note] is usurious under C.R.S. § 5-12-103."[36] The Second Claim for Relief is very similar.  The Debtor requested that the Lender's Proof of Claim be disallowed under Section 502(b) and "pursuant to applicable state law, C.R.S. § 5-12-103" because the Lender's "claim for interest charged on the [Promissory Note] is usurious and in excess of the lawful amount that can be charged."[37] Finally, in the Third Claim for Relief, the Debtor demanded equitable subordination of the Lender's Proof of Claim under Section 510 on the basis that the Lender's Proof of Claim and conduct were "usurious," "illegal," and "inequitable" under Colorado law.[38] The Debtor also asserted that the Lender's attempt to recover on the Promissory Note was "in violation of the Colorado Criminal Code."[39]  In its Answer, the Lender denied that the interest rate in the Promissory Note was usurious or illegal under governing Wisconsin law.[40]

### B.   Debtor's Position in Written Closing Argument.

In all of its claims, the Debtor seeks to disallow or subordinate the Lender's Proof of Claim.  Citing COLO. REV. STAT. § 5-12-103(1), the Debtor contends that Colorado law "prohibits interest rates on loans greater than 45%."[41]  Thus, the Debtor claims that the Promissory Note, which has the crazy interest rate of 120.86% per annum, is illegal and unenforceable.

---

[34]   *Id.*

[35]   In filing the proof of claim, the Lender is asserting its rights as a creditor.  *See* 11 U.S.C. § 101(10)(A) (defining "creditor" to mean an "entity that has a claim against the debtor that arose at the time of or before the order for relief concerning the debtor."  *See also* 11 U.S.C. § 102(2) (defining "claim against the debtor" to include a "claim against property of the debtor").

[36]   Compl. at 3.

[37]   Compl. at 4.

[38]   *Id.*

[39]   *Id.*

[40]   Answer at 3.  In addition to its denials of the allegations in the Complaint, the Lender also asserted some affirmative defenses in its Answer.  The Lender argued that:  "Plaintiff lacks standing to challenge the interest rate on the Note" and "[t]here has been a failure to join indispensable parties."  Answer at 3.  Although the Court doubts the Debtor's standing, the Lender failed to develop and present such argument in its written legal briefs.

[41]   Docket No. 36 at 6.

With respect to the First and Second Claims for Relief, the Debtor concedes that the text of the Promissory Note contains a Wisconsin choice of law provision. Furthermore, the Debtor acknowledges that "in Wisconsin, there is no limit on the interest rate chargeable to a corporation or limited liability company."[42]  However, the Debtor argues that the Wisconsin choice of law clause in the Promissory Note is of no moment.  First, the Debtor insists that the Court must apply Colorado conflict of law analysis and that Colorado utilizes Restatement Section 187 for such issues.  According to the Debtor, the Wisconsin choice of law provision is unenforceable because "application of Wisconsin law would be contrary to the strong public policy of Colorado" and "Wisconsin has no significant relationship to the transaction."[43]  Alternatively, the Debtor proposes that the Court focus on the Deed of Trust instead of the Promissory Note.  The Deed of Trust is governed by "federal law and the law of the jurisdiction in which the Property is located."  And, the Property is located in Colorado.  So, the Debtor reasons that the Deed of Trust prevails over the Promissory Note.

With respect to the Third Claim for Relief, the Debtor requests equitable subordination under Section 510(c) because the Lender allegedly has engaged in "inequitable conduct."[44]  The asserted "inequitable conduct" is only that the Lender attempted to enforce the Promissory Note.  The Debtor claims such enforcement is inequitable because it violates Colorado usury law.[45]  So, the equitable subordination claim depends entirely on the Court's finding that Colorado usury law applies to the Promissory Note.

## C.      Lender's Position in Written Closing Argument.

The Lender's initial position was deceptively straightforward:  Wisconsin law governs the Promissory Note, and Wisconsin substantive law has no restrictions on interest rates charged to corporate entities.[46]  Put another way, there is no such thing as corporate usury in Wisconsin.  While the Lender asks the Court to enforce the choice of law provision in the Promissory Note as written, the Lender nevertheless seemed to concede that Colorado conflict of law analysis and Restatement Section 187 may come into play.  If so, the Lender argues that "Colorado courts have held that the parties may agree to what state law will govern and control the contract" in a series of decisions about interest rates.[47]  The Lender contends that there is a strong relationship with Wisconsin because the Promissory Note was "made in Wisconsin" and Wisconsin has valid reasons for excepting corporate loans from usury statutes.[48]  The Lender also asserts that enforcement of the Promissory Note would not violate any fundamental public policy of Colorado.  So, Wisconsin substantive law should be used and such law permits the enforcement of the interest rate because there is no corporate usury.  **D.**

---

42      Docket No. 36 at 8.
43      Docket No. 36 at 6.
44      Docket No. 36 at 9-11.
45      *Id.*
46      Docket No. 35 at 4-6.
47      *Id.*
48      *Id.*

**The Order for Additional Briefing and the Parties' Positions in Supplemental Briefing.**

Having considered the Parties' respective legal positions in their written Closing Arguments, the Court concluded that additional legal briefing was necessary to assist the Court in resolving this Adversary Proceeding. Accordingly, the Court issued the Order for Additional Legal Briefing and requested that the Parties address nine legal topics bearing on the applicable choice of law.

In its Supplemental Legal Briefs, the Debtor stuck with its original position that Colorado conflict of law analysis (which adopts Restatement Section 187) should be used for purposes of selecting the proper substantive law governing the Promissory Note. According to the Debtor, the correct applicable substantive law is Colorado law — not Wisconsin law. Further, Colorado substantive law effectively invalidates the interest rate in the Promissory Note because it is usurious. Alternatively, the Debtor also continued to argue that the focus should be on the Deed of Trust (which is governed by Colorado law) rather that the Promissory Note.

Whilst the Debtor remained steadfast, the Lender modified its legal position, at least in part, in its Supplemental Legal Briefs. The Lender now contends that federal statutory law, particularly 12 U.S.C. § 1831(d), or federal common law, governs the issue whether the Promissory Note is usurious. The Lender argues that federal law permits the application of Wisconsin substantive law to the Promissory Note. And, under Wisconsin substantive law, the Promissory Note is not usurious. The Lender also contends that if Colorado choice of law is considered, the proper framework is the Colorado Uniform Commercial Code. Finally, the Lender falls back to its original arguments that (1) the Promissory Note should be construed only under Wisconsin substantive law because of the choice of law clause; and/or (2) even if Restatement Section 187, as adopted in Colorado, should be used for purposes of selecting the proper substantive law governing the Promissory Note, the result is that Wisconsin law is the proper substantive law. And, again, Wisconsin substantive law does not prohibit corporate usury.

## VI.   Legal Analysis of Interstate Interest Rates

### A.   Importance of Determining the Applicable Substantive Law.

The Parties agree on all of the material facts. Thus, this dispute turns on the applicable substantive law. *The key legal issue in this Adversary Proceeding is whether the ultra-high interest rate in the Promissory Note — in excess of 120% per annum — is lawful and permissible.* The contest depends on the applicable substantive law: Federal law or the State law of either Wisconsin or Colorado. The applicable substantive law matters because it differs. Federal statutory law in the area of banking interest rates principally is derived from State law. Federal common law also depends on State law.

And, Wisconsin and Colorado usury laws differ.  Wisconsin law is *laissez-faire*[49] and permits a corporation to borrow money at any interest rate it agrees to.  Colorado law, on the other hand, intervenes in financial decision-making by imposing usury protections for all borrowers, including corporations.

### 1.    __Federal Statutory Law Concerning Interstate Interest Rates__.

To determine the correct substantive law, the Court starts with the terms of the Promissory Note, which provides:

> Lender [the Bank of Lake Mills] is an FDIC insured, Wisconsin state chartered bank and this Loan Agreement is accepted by [the Bank of Lake Mills] in Wisconsin. CONSEQUENTLY, THIS AGREEMENT WILL BE GOVERNED BY FEDERAL LAW APPLICABLE TO AN FDIC INSURED INSTITUTION AND TO THE EXTENT NOT PREEMPTED BY FEDERAL LAW, THE LAW OF THE STATE OF WISCONSIN WITHOUT REGARD TO CONFLICT OF LAW RULES.  The legality, enforceability and interpretation of this Agreement and the amounts contracted for, charged and served under this Loan Agreement will be governed by such laws.[50]

Thus, the parties agreed to a primary law (*i.e.*, "Federal law applicable to an FDIC insured institution") and a secondary or contingent law (*i.e.,* "the law of the State of Wisconsin") applicable in the event that federal law does not preempt Wisconsin law. The foregoing contractual provision and proper legal analysis of this dispute require the Court to determine whether there is any "Federal law applicable to a [State-chartered] FDIC insured institution" with respect to interstate interest rates.  There is.

The United States has a "dual banking system," which "divides chartering and regulatory authority over banks" between the Federal government and the States.  Jay B. Sykes, *Banking Law:  An Overview of Federal Preemption in the Dual Banking System,*" at 4 (Congressional Research Service, Jan. 23, 2018).  The dual banking system has its origins in the National Bank Act of 1864, 12 U.S.C. § 1 *et seq.* (the "NBA") and includes "national banking associations" (commonly referred to as "national banks") and state-chartered banks (commonly referred to as "state banks").  As the respective terms suggest, "national banks" are chartered and regulated by the Federal government (*see* 12 U.S.C. § 21 (governing formation of national banks)); whereas "state banks" are chartered by States and regulated by both the Federal government and State governments.

---

[49]      "*Laissez-faire*" is a French term that translates roughly to as "let (people) do as they choose." Bryan A. Garner, BLACK'S LAW DICTIONARY (Thompson Reuters 10th Ed. 2014).

[50]      Ex. 1 ¶ 15(c) (emphasis in original).

      a.    **National Banks**.

Federal statutory law governs the rate of interest that national banks may charge for interstate transactions.  More than a century ago, Congress enacted 12 U.S.C. § 85 (hereinafter, "NBA Section 85"), which provides:

> Any [National banking] association may take, receive, reserve, and charge on any loan or discount made, or upon any notes, bills of exchange, or other evidences of debt, interest at the rate allowed by the laws of the State . . . where the bank is located, or a rate of 1 per centum in excess of the discount rate on ninety-day commercial paper in effect at the Federal reserve bank in the Federal reserve district where the bank is located, whichever may be the greater, and no more . . . .

Thus, with respect to interest rates, "national banks" have been characterized as "National favorites" since they may charge interest based on either:  (1) the federal commercial paper rate plus one percent; or (2) the highest rate allowed by state law where the national bank is located.  *Tiffany v. Nat'l Bank of Mo.*, 85 U.S. 409, 413 (1873).  Since the permissible state law interest rate typically exceeds the federal commercial paper rate, state law interest rates generally serve as the basis to derive the maximum interest rate allowed by the NBA for national banks.  However, even if the maximum interest rate is *derived* from state law, it is still *governed* by federal law. Michael P. Malloy, 2 Banking Law and Regulation § 6.02[D] (Wolters Kluwer Supp. 2017).

The NBA also provides a remedy in the event a national bank charges interest in excess of the permissible NBA interest rate:

> The taking, receiving, reserving, or charging a rate of interest greater than is allowed by section 85 of this title, when knowingly done, shall be deemed a forfeiture of the entire interest which the note, bill, or other evidence of debt carries with it, or which has been agreed to be paid thereon.  In case the greater rate of interest has been paid, the person by whom it has been paid, or his legal representatives, may recover back, in an action in the nature of an action of debt, twice the amount of the interest thus paid from the association taking or receiving the same . . . .

12 U.S.C. § 86 ("NBA Section 86").

b.    **State Banks.**

Congress enacted a state bank analog to Section 85 through the Depository Institutions Deregulation and Monetary Control Act of 1980 (the "DIDA"), which was designed "to create parity between national and state banks."  *Stoorman v. Greenwood Trust Co.*, 908 P.2d 133, 135 (Colo. 1995).  The main provision governing the interest rates that state banks may charge is 12 U.S.C. § 1831d (hereinafter "DIDA Section 1831d").[51]  Section 1831d is titled, "State-chartered insured depository institutions and insured branches of foreign banks," and states:

> (a) Interest Rates
>
> In order to prevent discrimination against State-chartered insured depository institutions . . . with respect to interest rates, if the applicable rate prescribed in this subsection exceeds the rate such State bank . . . would be permitted to charge in the absence of this subsection, such State bank . . . may, notwithstanding any State constitution or statute which is hereby preempted for the purposes of this section, take, receive, reserve, and charge on any loan . . . or upon any note, bill of exchange, or other evidence of debt, interest at a rate of not more than 1 per centum in excess of the discount rate on ninety-day commercial paper in effect at the Federal reserve bank in the Federal reserve district where such State bank . . . is located or at the rate allowed by the laws of the State, territory, or district where the bank is located, whichever may be greater.

12 U.S.C. § 1831d(a).  Congress also provided a remedy (similar to Section 86 of the NBA) in the event that a state-chartered insured depository institution charges interest in excess of the Section 1831d(a) permissible interest rate:

> (b) Interest overcharge; forfeiture, interest payment recovery
>
> If the rate prescribed in subsection (a) of this section exceeds the rate such State bank . . . would be permitted to charge in the absence of this section, and such State fixed rate is thereby preempted by the rate described in subsection (a) of this section, the taking, receiving, reserving, or charging a greater rate of interest than is allowed by subsection (a) of this section, when knowingly

---

[51]    DIDA Section 1831d was codified as part of the Federal Deposit Insurance Act, 12 U.S.C. § 1811 *et seq.*  Thus, some courts utilize the acronym "FDIA" instead of "DIDA."  The difference is of no substantive moment.  The Court chooses to use "DIDA" when referring to 12 U.S.C. § 1831d, since that acronym refers to the name of the legislation used by Congress to regulate state bank interest rates.

> done, shall be deemed a forfeiture of the entire interest
> which the note, bill, or other evidence of debt carries with it
> . . . . If such greater rate of interest has been paid, the
> person who paid it may recover in a civil action . . . an
> amount equal to twice the amount of the interest paid from
> such State bank . . . .

12 U.S.C. § 1831d(b).  Thus, DIDA Section 1831d for state banks is the mirror image of NBA Sections 85 and 86 for national banks.  As with the NBA, although the DIDA maximum interest rate for state banks usually is *derived* from state law, it is *governed* by federal law.  Importantly, the DIDA Section 1831d expressly provides for federal preemption.

### 2.    Federal Common Law Applicable to Interstate Interest Rates.

While the NBA and the DIDA govern the interest rates that may be charged by national and state banks, federal common law also governs the choice of law determination of the applicable interest rate for certain non-banking interstate transactions.  The key case is *Seeman v. Philadelphia Warehouse Co.*, 47 S. Ct. 626 (1927).  In that decision, the United States Supreme Court held:

> 'The general principle in relation to contracts made in one
> place, to be executed in another, is well settled. They are to
> be governed by the law of the place of performance, and if
> the interest allowed by the laws of the place of performance
> is higher than that permitted at the place of the contract, the
> parties may stipulate for the higher interest, without incurring
> the penalties of usury.'

*Id*. at 627 (quoting *Andrews v. Pond*, 38 U.S. 65 (1839)).  Thus, the federal common law applicable to conflicts of law incorporates the state law of "the place of performance."

### 3.    Wisconsin Substantive Usury Law.

Under current Wisconsin law, individual consumers may not be charged interest in excess of 12% on small loans.  But, there is no corporate usury.  Instead, corporations can make their own financial decisions — even bad decisions — free of government interference.

The Wisconsin legislature adopted WIS. STAT. ANN. § 138.05(1), which states, in relevant part:

> . . . no person shall, directly or indirectly, contract for, take or
> receive in money, goods or things in action, or in any other
> way, any greater sum or any greater value, for the loan or
> forbearance of money, goods or things in action, than:

> (a) At the rate of $12 upon $100 for one year computed upon
> the declining principal balance of the loan or forbearance . . .

Although the foregoing usury provision appears to apply broadly, there are at least two important statutory exceptions:

- "This section shall not apply to loans to corporations or limited liability companies," WIS. STAT. ANN. § 138.05(5); and

- "This section does not apply to any loan or forbearance in the amount of $150,000 or more . . . unless secured by an encumbrance on a one- to four- family dwelling which the borrower uses as his or her principal place of residence[.]"  WIS. STAT. ANN. § 138.05(7).

The corporate clause exception to usury has been part of Wisconsin law since 1878.  *See Country Motors, Inc. v. Friendly Fin. Corp.*, 109 N.W.2d 137, 139 (Wis. 1961) (explaining various Wisconsin usury laws dating to Wisconsin statehood).  In Wisconsin, "a corporation can not assert the defense of usury."  *Feest v. Hillcrest Cemetery, Inc.,* 19 N.W. 2d 246, 248 (Wis. 1945); *see also Wild, Inc. v. Citizens Mortg. Inv. Tr.*, 290 N.W. 2d 567, 568 (Wis. App. 1980) ("A strict construction of the [usury] statute requires a broad construction of the corporation exception to the statute.")  But why the exception for corporations?  According to Wisconsin jurisprudence, the Wisconsin legislature figured that corporations could protect themselves:

> Loans to corporations are excepted from the protections of the usury statute because corporations are less likely to yield to the pressures of necessity and pay unwarranted interest rates. . . .  The policy behind the corporation exception is to allow corporations to attract capital by paying any interest they can afford.  Because corporations generally have greater bargaining power than individuals and because corporate shareholders are protected by limited liability, this policy is a viable one.

*Citizens Mortg.*, 290 N.W. 2d at 568 (citations omitted).  The corporate exception was not the only exception.  Wisconsin also excepted big loans.  The Wisconsin Court of Appeals explained:  "[T]he policy behind the usury law is the protection of borrowers of small sums of money.  Anyone with the assets or financial backing needed to borrow over $150,000 is not the type of borrower who will be forced by necessity to agree to unwarranted interest rates."  *Id.* at 569.

Thus, to the extent that Wisconsin substantive law applies to the Promissory Note, the exorbitant interest rate — in excess of 120% per annum — would be valid because the Debtor is a corporation and also since the original principal amount ($550,000) greatly exceeded the $150,000 statutory cap (and the loan was not secured

by an individual's primary residence).  *See Group One Dev., Inc. v. Bank of Lake Mills*, 2017 WL 2937709 (S.D. Tex. July 7, 2017) (dismissing claim for violation of Texas usury law against Bank of Lake Mills based upon WIS. STAT. ANN. §§ 138.05(5) and 138.05(7)).  Even the Debtor acknowledges that "[u]nder Wisconsin law, the interest rate charged in the Promissory Note is allowable."[52]

### 4. <u>Colorado Substantive Usury Law</u>.

Colorado went the other way on interest rates.  The Colorado legislature decided to intervene in the market.  It established 8% per annum, compounded annually, as the "legal rate of interest" applicable "[i]f there is no agreement or provision of law for a different rate."  COLO. REV. STAT. § 5-12-101.  Colorado "statutory interest" is similar.  COLO. REV. STAT. § 5-12-102.  Notwithstanding these presumptions, the Colorado legislature allowed Colorado parties to contract to higher interest rates but established usury limits:

> (1) *The parties to any . . . promissory note*, or other instrument of writing *may stipulate* therein *for the payment of a greater or higher rate of interest than eight percent per annum, but not exceeding forty-five percent per annum*, and any such stipulation may be enforced in any court of competent jurisdiction in the state . . . .

COLO. REV. STAT. § 5-12-103 (emphasis added) (the "Colorado Usury Statute").  Although the Colorado Usury Statute is located in the "Colorado Consumer Credit Code" (COLO. REV. STAT. § 5-1-101 *et seq.*), the usury prohibition applies to "non-consumer" transactions."  *Concord Realty v. Cont'l Funding*, 776 P.2d 1114, 1120 (Colo. 1989).  In fact, the Colorado Usury Statute "applies only to nonconsumer loans."  *Dikeou v. Dikeou*, 928 P.2d 1286, 1293 (Colo. 1996).  Violation of the Colorado Usury Statute is a criminal offense.  COLO. REV. STAT. § 18-15-104 ("Any person who knowingly . . . charges . . . an annual percentage rate [of interest] of forty-five percent . . . commits the crime of criminal usury, which is a class 6 felony.").

Thus, to the extent that the Colorado Usury Statute applies to the Promissory Note, the exorbitant interest rate — in excess of 120% per annum — would be invalid.  Instead, the Promissory Note would only be enforceable at the maximum 45% interest rate under the Colorado Usury Statute.  *Brown v. Fenner*, 757 P.2d 184, 184 (Colo. App. 1988) ("A usurious contract is void only to the extent the interest is usurious."); *Becker v. Mktg. & Research Consultants, Inc.*, 526 F. Supp. 166, 169 (D. Colo. 1981) (same); *Dennis v. Bradbury*, 236 F. Supp. 683, 691-92 (D. Colo. 1964) (under Colorado law, a usurious contract is void to the extent of the usurious interest).

---

[52]     Docket No. 39 at 20.

B.   **Under DIDA Section 1831d, the Promissory Note Interest Rate Is Permissible**.

    1.   **DIDA Section 1831d Allows the Promissory Note Interest Rate Because Bank of Lake Mills is a Wisconsin State Bank and the Interest Rate Is Valid Under Wisconsin Law**.

Federal law governs the interest rates that may be charged by national and state banks in interstate commerce.  Bank of Lake Mills originated the Promissory Note.  The Promissory Note identifies Bank of Lake Mills as an "FDIC insured, Wisconsin chartered bank" located at "136 E. Madison St., Lake Mills, WI."[53]  As a state bank, Bank of Lake Mills falls within the purview of the DIDA.  Under DIDA Section 1831d, Bank of Lake Mills was permitted to charge interest "at the rate allowed by the laws of the State . . . where the bank is located."  Since Bank of Lake Mills is located in Wisconsin, it was authorized to charge interest at the rate allowed in Wisconsin.  Wisconsin does not have corporate usury.  WIS. STAT. ANN. § 138.05(5).  Furthermore, given the amount borrowed under the Promissory Note, any general Wisconsin limitations on interest rates do not apply.  WIS. STAT. ANN. § 138.05(7).  Thus, as a matter of federal law, and as derived from Wisconsin usury law, the Promissory Note interest rate is permissible (at least as applied to Bank of Lake Mills) even though it is extraordinarily high.

The United States Supreme Court's decision in *Marquette Nat'l Bank of Minneapolis v. First Omaha Serv. Corp.*, 99 S. Ct. 540 (1978) is key.  In that case, the question was:

> . . . whether the National Bank Act . . . 12 U.S.C. § 85, authorizes a national bank based in one State to charge its out-of-state credit-card customers an interest rate on unpaid balances allowed by its home State, when that rate is greater than that permitted by the State of the bank's nonresident customers.

*Id.* at 542.  The national bank was based in Nebraska.  Nebraska law allowed a 18% per annum interest rate.  However, the customers were located in Minnesota where the usury law permitted annual interest of only 12%.  Thus, the rub.  The Supreme Court issued a succinct and unanimous opinion determining that the interest rate was "governed by federal law" and under the "plain language" of NBA Section 85, the national bank located in Nebraska could export its higher Nebraska interest rates to transactions with Minnesota customers.  *Id.* at 545, 548.

The *Marquette Nat'l Bank* decision followed about a century of federal appellate jurisprudence repeatedly affirming the primacy of NBA Section 85 over state usury statutes.  *See*, *e.g.*, *Evans v. Nat'l Bank of Savannah,* 251 U.S. 108, 114 (1919) (holding that federal law "completely defines what constitutes the taking of usury by a

---

[53]    Ex. 1 ¶ 1; *see also id.* at ¶ 15(c).

national bank, referring to the state law only to determine the maximum permitted rate"); *Haseltine v. Central Bank of Springfield,* 183 U.S. 132, 134 (1901) ("[T]he definition of usury and the penalties affixed thereto must be determined by the [NBA], and not by the law of the State"); *Barnet v. Nat'l Bank,* 98 U.S. 555, 558 (1879) (holding that the "statutes of Ohio and Indiana upon the subject of usury . . . cannot affect the case" because the NBA "creates a new right" that is "exclusive").

More recently, the Supreme Court addressed the topic of the NBA and state usury law in the context of federal removal. *Beneficial Nat'l Bank v. Anderson*, 123 S. Ct. 2058 (2003). In that case, Alabama customers who obtained loans from an out-of-state national bank sued in state court for alleged violation of an Alabama usury statute. The national bank removed the case to federal court and an appeal ensued. The Supreme Court permitted federal removal of the case and ruled:

> In actions against national banks for usury, these provisions [NBA Section 85 and 86] supersede both the substantive and the remedial provisions of state usury laws and create a federal remedy for overcharges that is exclusive, even when a state complainant, as here, relies entirely on state law. Because §§ 85 and 86 provide the exclusive cause of action for such claims, *there is, in short, no such thing as a state-law claim of usury against a national bank.*

*Id.* at 2064 (emphasis added). Put another way, the NBA preempts state usury law in relation to national banks. *See also Barnett Bank of Marion County, N.A. v. Nelson*, 517 U.S. 25 (1996) (federal statute granting national banks' authority to sell insurance preempted Florida statute prohibiting national banks from selling insurance).

The foregoing Supreme Court decisions, *Beneficial Nat'l Bank, Marquette Nat'l Bank, Nat'l Bank of Savannah, Central Bank of Springfield,* and *Barnet,* all construed NBA Sections 85 and 86 in cases involving national banks. Bank of Lake Mills is not a national bank. Instead, it is a state bank. Thus, NBA Section 85 and 86 do not apply directly in this Adversary Proceeding. *See Mamot Feed Lot & Trucking v. Hobson*, 539 F.3d 898, 902 (8th Cir. 2008) ("the National Bank Act does not apply to state-chartered banks"); *First & Beck, a Nevada LLC v. Bank of Southwest,* 267 Fed. Appx. 499, 501 (9th Cir.2007) (unpublished) ("12 U.S.C. § 85 provides for a cause of action only against nationally-chartered banks").

However, DIDA Section 1831d (applicable to state banks) is the mirror image of NBA Sections 85 and 86 (applicable to national banks). Federal courts routinely interpret and apply DIDA Section 1831d in accordance with NBA Sections 85 and 86. *Mamot Feed Lot*, 539 F.3d at 902-03; *Discover Bank v. Vaden*, 489 F.3d 594, 604-06 (4th Cir. 2007) (noting that DIDA Section 1831d "is to state-chartered banks" as the NBA "is to national banks"), *rev'd on other grounds* 129 S. Ct. 1262 (2009); *Stoorman*, 908 P.2d at 135 (giving the "same interpretation" to DIDA Section 1831d and NBA Section 85). Put another way by the United States Court of Appeals for the First Circuit:

19

Congress made a conscious choice to incorporate the [NBA] standard into DIDA [Section 1831d]. . . .

The historical record clearly requires a court to read the parallel provisions of DIDA and the [NBA] *in pari materia* . . . . [NBA] precedents must inform our interpretation of the words and phrases that were lifted from the [NBA] and inserted into DIDA's text.

*Greenwood Tr. Co. v. Mass.*, 971 F.2d 818, 827 (1st Cir. 1992).

The type of usury claim now advanced by the Debtor in this Adversary Proceeding is untenable (at least as applied to Bank of Lake Mills) under DIDA Section 1831d. *See Beneficial Nat'l Bank*, 123 S. Ct. 2058 (state law usury claim completely preempted by NBA Section 85 and 86); *Hawaii ex rel. Louie v. HSBC Bank Nevada, N.A.*, 761 F.3d 1027 (9th Cir. 2014) (two provisions in the NBA "completely preempt state law claims challenging interest rates charged by national banks"); *Discover Bank*, 489 F.3d at 604-06 (recognizing complete preemption of usury claims); *Greenwood Trust*, 971 F.2d at 822-31 (same). The Supremacy Clause of the United States Constitution bars the Debtor from successfully prosecuting a claim against a state bank under the Colorado Usury Statute that conflicts with DIDA Section 1831d. Instead, the Promissory Note interest rate, which complies with DIDA Section 1831d, is generally permissible. *See Stoorman*, 908 P.2d at 136 ("Because Greenwood is a federally-insured, state-chartered bank located in Delaware, and Delaware law permits the imposition of a late payment fee, Greenwood can charge Stoorman a ten dollar late payment fee despite the fact that a Colorado consumer protection law prohibited such fees."); *Copeland v. MBNA Am. Bank, N.A.*, 907 P.2d 87 (Colo. 1995).

## 2. The Promissory Note Interest Rate Is Permissible Despite Assignment.

The Court's foregoing legal analysis focused on the role of Bank of Lake Mills, the state bank that originated the Promissory Note. However, this Adversary Proceeding presents a slightly different and more complicated scenario because Bank of Lake Mills assigned the Promissory Note to the Lender on or about June 13, 2016.[54] The Lender, as the current holder of the Promissory Note, is neither a national bank nor a state bank. Furthermore, Bank of Lake Mills is not a party in this Adversary Proceeding. The Debtor argues that Section 1831d simply "does not apply to actions against non-banks."[55] So, having determined the Promissory Note interest rate generally is permissible regardless of the Colorado Usury Statute (at least in relation to Bank of Lake Mills) the Court also must consider whether the assignment of the

---

[54]    Stip. Fact No. 5; Ex. 3.
[55]    Docket No. 39 at 9.

Promissory Note to the Lender changes the result.  It is another difficult question in an Adversary Proceeding chock full of tough issues.

A state bank, like Bank of Lake Mills, has the power to charge interest rates authorized by DIDA Section 1831d.  Furthermore, as a corollary and a matter of general contract law, state banks also have the power to assign promissory notes with such compliant interest rates to other entities, including national banks, other state banks, and non-banks such as the Lender.  This has been an American rule for centuries.  *See Planters' Bank of Miss. v. Sharp*, 47 U.S. 301, 322 (1848) (holding that state law that barred state bank from transferring a loan violates the constitutional prohibition on state impairment of contracts under Art. I, § 10, Cl. 1 U.S. CONST.).  As the United States Supreme Court recognized, "in discounting notes and managing its property in legitimate banking business, it [state bank] must be able to assign or sell those notes when necessary and proper . . . ."  *Id.* at 323.  This right to assign also was agreed upon in the Promissory Note, which states:  "This Loan Agreement, or an interest in this Loan Agreement, together with the rights to the Collateral, may be sold, assigned, transferred or conveyed by Lender [Bank of Lake Mills] one or more times."[56]  So, Bank of Lake Mills had the power to sell the Promissory Note (which was not usurious when it was originated) to the Lender.

The question then becomes whether a promissory note originated by a state bank with a non-usurious interest rate under DIDA Section 1831d somehow can be transformed into a usurious promissory note by virtue of assignment to a non-bank entity.  The long-established "valid-when-made" rule answers the question.  Under that rule, if the interest rate in the original loan agreement was non-usurious, the loan cannot become usurious upon assignment — so, the assignee lawfully may charge interest at the original rate.  Multiple United States Supreme Court decisions have adopted the "valid-when-made" rule.  For example, in *Gaither v. Farmers & Mechs. Bank of Georgetown*, 26 U.S. 37 (1828), the Supreme Court stated that "the rule cannot be doubted, that if the note [is] free from usury, in its origin, no subsequent usurious transactions respecting it, can affect it with the taint of usury."  *Id.* at 43.  Several years later, but still a very long time ago, the Supreme Court stated that a "cardinal rule[] in the doctrine of usury" is that "a contract, which, in its inception, is unaffected by usury, can never be invalidated by any subsequent usurious transaction."  *Nichols v. Fearson*, 32 U.S. 103, 109 (1833).  Those long-accepted principles were inherently incorporated into the NBA and, later, the DIDA.

In the Court's view, the "valid-when-made" rule remains the law.  With respect to usury, the focus must be on the legality or illegality of the interest rate at the time of the origination of the loan.  *See Phipps v. FDIC*, 417 F.3d 1006, 1013 (8th Cir. 2005) ("Courts must look at 'the originating entity (the bank), and not the ongoing assignee . . . in determining whether the NBA applies.'") (ellipses in original); *Krispin v. May Dep't Stores Co.*, 218 F.3d 919, 924 (8th Cir. 2000) (same); *FDIC v. Lattimore Land Corp.*,

---

[56]      Ex. 1 ¶ 13; *see also* Ex. 1 ¶ 15(m) ("The terms of this Loan Agreement shall be binding upon Borrower and its permitted successors and assigns, and shall inure to the benefit of the Lender and its successors and assigns.").

656 F.2d 139 (5th Cir. 1981) ("The non-usurious character of a note should not change when the note changes hands.").

Any contrary legal standard would interfere with the proper functioning of state banks and risks a myriad of problems.  *See Nichols*, 32 U.S. 110 ("a contract, wholly innocent in its origin, and binding and valid, upon every legal principle, [would be] rendered, at least valueless, in the hands of the otherwise legal holder"); *Olvera v. Blitt & Gaines, P.C.*, 431 F.3d 285, 287-88 (7th Cir. 2005) (a contrary rule would "produce[] a senseless result" which "would push the debt buyers out of the debt collection market and force the original creditors to do their own debt collection"); *LFG Nat'l Capital, LLC v. Gary, Williams, Finney, Lewis, Watson & Sperando P.L.*, 874 F. Supp. 2d 108, 125 (N.D.N.Y. 2012) (explaining that a contrary rule "would in effect prohibit — make uneconomic — the assignment or sale by banks of their commercial property to a secondary market").

The Debtor's argument against the validity of the Promissory Note interest rate seems to turn entirely on the vagaries of current ownership of the Promissory Note. Such a focus makes little logical sense.  Suppose for example that the Lender reassigned the Promissory Note back to Bank of Lake Mills.  Presumably, under the Debtor's reasoning, the Promissory Note interest rate would be non-usurious (when originated and held by Bank of Lake Mills), then usurious (when assigned and held by the Lender), then non-usurious once again (when assigned back and held by Bank of Lake Mills).  What if the Lender reassigned the Promissory Note to a different Wisconsin state bank?  Under the Debtor's rationale, the Promissory Note interest rate would again be non-usurious.  Or suppose that the Lender itself originated the loan with an admittedly usurious interest rate.  Would assignment to a Wisconsin state bank cure the illegality problem because the Wisconsin state bank later became the holder of the evidence of indebtedness?  The Debtor's current-assignee focus would seem to permit such usurious loans to be assigned to Wisconsin state banks and then insulated from usury.  The questions are rhetorical but illustrate the hot mess that results from focusing on the current holder rather than the originating lender.  The "valid-when-made" rule, which focuses on the originating entity, resolves such problems in a clear and concise fashion that has withstood the test of time.

Arguing against the application of DIDA Section 1831d to non-bank assignees, the Debtor relies almost exclusively on *Meade v. Avant of Colorado, LLC*, 307 F. Supp. 3d 1134 (D. Colo. 2018).[57]  The Debtor correctly quotes certain passages from *Meade*, which seem, at first blush, to support its argument.  For example, the *Meade* court did state that "the cause of action provided by § 1831d(b), does not on its face apply to actions against non-banks . . . ."  *Id.* at 1145.  But while the Court appreciates the

---

[57]     Although not cited by the Debtor, other decisions support the Debtor's concentration on the assignee.  *See Madden v. Midland Funding, LLC*, 786 F.3d 246 (2d Cir. 2015) (determining that NBA did not preempt usury claims against non-bank).  For the reasons set forth in this decision, the Court respectfully disagrees with *Madden*, 786 F.3d 246.  However, the decision certainly illustrates the difficulty of the legal issues presented in this Adversary Proceeding.

Debtor's argument, ultimately the Court determines that the holding of *Meade* is distinguishable from the context of this Adversary Proceeding.

In *Meade*, the administrator of the Colorado Uniform Consumer Credit Code brought an enforcement action in state court against two non-bank Delaware corporate entities that had purchased loans originated by a state bank. The administrator asserted that the Delaware corporate defendants violated Colorado's statutory limits on excessive finance and delinquency charges for Colorado consumer loans. The defendants removed the action from state court to federal court, arguing that DIDA Section 1831d "*completely preempted* the state law claims at issue." *Id.* at 1137 (emphasis added). The administrator contested removal. Thus, the *Meade* decision concerns only the discrete issue of federal removal jurisdiction by virtue of complete preemption.

Ultimately, the *Meade* court determined that complete preemption did not apply to the state law claims against the non-bank defendants. Thus, the Court remanded the case back to state court. But, since the *Meade* decision only involved "complete preemption," the district court did not have occasion to consider whether the claims against the non-bank defendants were defensively preempted by "express preemption," "conflict preemption," or "field preemption." The final holding of *Meade* is quite limited:

> Whether or not Section 27 [DIDA Section 1831d] gives rise to a *defense* of preemption on the merits of Plaintiff's claims, it does not establish complete preemption or permit *removal* of the Administrator's exclusively state-law claims to federal court.

*Id.* at 1145 (emphasis in original). After making the dispositive ruling requiring remand, the *Meade* court also referenced the defendants' "valid-when-made" argument:

> [T]he Court agrees . . . that these arguments [that the "valid-when-made" rule was firmly entrenched] have little, if any, bearing on the issue of complete preemption . . . . Even assuming the valid-when-made rule does provide [the defendants] with a complete defense against the Administrator's claims . . . absolutely nothing prevents [the defendant] (or any other similarly-situated assignee of bank-originated debt) from asserting those arguments and maintaining that preemption defense in the *state* courts.

*Id.* at 1152 (emphasis in original).

Thus, the *Meade* decision has very little import in this Adversary Proceeding. The Court is not called upon to consider removal jurisdiction under 28 U.S.C. §§ 1331 and 1441 by virtue of alleged "complete preemption." The *Meade* court left open the defenses of "express preemption," "conflict preemption," and "field preemption." The

defendant Lender is asserting preemption defensively in this case.  And, the *Meade* holding does not foreclose the application of DIDA Section 1831d to assignees of loans originated by state banks.  In the end, although the decision is close, the Court concludes that DIDA Section 1823d allows interest to be calculated under substantive Wisconsin law and bars the claims asserted by the Debtor under the Colorado Usury Statute.  The Promissory Note interest rate, which is extraordinarily high, is permissible as a matter of federal law.[58]  Notwithstanding, the Court analyzes the other choice of law issues raised by the Parties.

C.   **Under Federal Choice of Law Principles, Wisconsin Substantive Law Applies so the Promissory Note Interest Rate Is Permissible**.

In its Closing Argument, the Debtor contended that "[i]n determining a choice of law issue, a federal court must apply the choice of law rules of the jurisdiction in which it

---

[58]      The Debtor contends that the Lender waived "federal preemption as an affirmative defense" by failing to raise such defense in its Answer.  The Debtor cites a litany of decisions for the proposition that "federal preemption" is an "affirmative defense" and must be asserted in the pleadings.  *See Schneider v. Wilcox Farms, Inc.*, 2008 WL 2367183, at *2 (W.D. Wash. Jun. 6, 2008) ("Avoidance defenses such as federal preemption are waived if not raised in the pleadings."); *DIRECTV, Inc. v. Barrett*, 311 F. Supp. 2d 1143, 1147 (D. Kan. 2004) ("The court holds here that preemption is an 'avoidance or affirmative defense' that must be pleaded pursuant to Fed. R. Civ. P. 8(c).").  However, even according to the precedent cited by the Debtor, "the Tenth Circuit has not addressed whether preemption is an 'avoidance or affirmative defense' that must be pleaded."  *Barrett*, 311 F.Supp.2d at 1147.  In *Cook v. Rockwell Int'l Corp.*, 790 F.3d 1088, 1092 (10th Cir. 2015), the United States Court of Appeals for the Tenth Circuit observed that "potential preemption defenses, like most other affirmative defenses, are forfeited if not made."  But, the Tenth Circuit did not clearly state when a preemption defense must be "made."  The *Cook* decision relied on *Mauldin v. Worldcom, Inc.*, 263 F.3d 1205, 1211 (10th Cir. 2001).  In *Mauldin*, the appellate court only determined that "neither party argue[d] that the contracts [were] subject to the Employee Retirement Income Security Act"; so, the appellate panel did not consider the issue.  *Id.* at 1211.  The *Mauldin* court did not determine that there was a waiver of a preemption argument by reason of its not being identified in a pleading.  *Hansen v. Harper Excavating, Inc.*, 641 F.3d 1216, 1221 (10th Cir. 2011) is similar.  In that case, the Tenth Circuit noted that "ordinary preemption" is a "federal defense"; however, the appellate panel did not characterize preemption as an affirmative defense that must be made in a pleading or be deemed waived.

In the absence of binding appellate precedent, the Court is reticent to decide the DIDA Section 1831d issue based on waiver.  First, preemption is not identified among the "avoidance or affirmative defenses" listed in Fed. R. Civ. P. 8(c)(1), as incorporated by Fed. R. Bankr. P. 7008.  Second, the Complaint refers to (and effectively incorporates) the Promissory Note, which refers to "federal law": "Lender [the Bank of Lake Mills] is an FDIC insured, Wisconsin state chartered bank . . . . CONSEQUENTLY, THIS AGREEMENT WILL BE GOVERNED BY FEDERAL LAW APPLICABLE TO AN FDIC INSURED INSTITUTION AND TO THE EXTENT NOT PREEMPTED BY FEDERAL LAW, THE LAWS OF THE STATE OF WISCONSIN."  Thus, DIDA Section 1831d is the applicable "federal law" referenced in the Promissory Note.  Third, in the Proof of Claim, the Debtor attached the Promissory Note.  Fourth, in its Answer, the Lender asserted as an "Affirmative Defense" that "the laws of the State of Wisconsin . . . govern the rate of interest on the Note" as well as asserting that the "Note speaks for itself."  And, in this case, DIDA Section 1831d depends on the same "laws of the State of Wisconsin."  Finally, the Lender argued in its Supplemental Legal Briefs that DIDA Section 1831d governs the usury issue.  Thus, the Court rejects the waiver argument whilst noting that the Lender should have been clearer in its Answer and legal briefing.

is situated."[59]   The Debtor then argued that "Colorado utilizes the Restatement (Second) of Conflict of Laws to resolve choice of law issues."[60]   Finally, the Debtor proposed that under such Colorado choice of law rules, substantive Colorado usury law should govern the Promissory Note and result in a determination of illegality and unenforceability.

The Debtor's choice of law analysis is flawed because the Debtor assumed that the Court is sitting in diversity under 28 U.S.C. § 1332.  The Debtor initially relied upon two decisions as precedent for its position:  *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 61 S. Ct. 1020 (1941); and *Dang v. UNUM Life Ins. Co. of Amer.*, 175 F.3d 1186, 1190 (10th Cir. 1999).

The United States Supreme Court identified the question in *Klaxon* as "whether *in diversity cases* the federal courts must follow conflict of law rules prevailing in the states in which they sit."  *Klaxon*, 61 S. Ct. at 1020 (emphasis added).  The Supreme Court ultimately determined that:

> [T]he prohibition declared in *Erie Railroad v. Tompkins* . . . against such independent determinations by the federal courts extends to the field of conflict of laws.  The conflict of laws rules to be applied by the federal court in Delaware must conform to those prevailing in Delaware's state courts. Otherwise the accident of diversity of citizenship would constantly disturb equal administration of justice in coordinate state and federal courts sitting side by side.

*Id.* at 1021 (footnote omitted).  And, *Dang* follows *Klaxon* by holding that "[a] federal court adjudicating state law claims must apply the forum state's choice of law principles."  *Dang*, 175 F.3d at 1190.

The problem is that the Court is not exercising diversity jurisdiction and is not adjudicating simple state law claims.  Instead, the Court has federal bankruptcy jurisdiction under 28 U.S.C. § 1334 and 28 U.S.C. § 157(b)(2)(A), (B), (C) and (O).[61] The main claim asserted by the Debtor is "Objection to and Disallowance of [the] Proof of Claim, 11 U.S.C. § 502."[62]  This claim is based upon federal bankruptcy law notwithstanding the Debtor's reference to the Colorado Usury Statute.  The Debtor asserts a companion claim for "Declaratory Judgment" requesting essentially the same relief.[63]  The Complaint identifies the source of the declaratory judgment action as Fed. R. Bankr. P. 7001(9), which governs bankruptcy adversary proceedings.[64]  Although the Complaint is not specific, presumably the Debtor also relies on 28 U.S.C. § 2201, which states:  "In a case of actual controversy within its jurisdiction, any court of the United

---

[59]  Docket No. 36 at 6.
[60]  *Id.*
[61]  Compl. ¶ 3.
[62]  Compl. Second Claim for Relief.
[63]  Compl. First Claim for Relief.
[64]  Compl. ¶ 5.

States . . . may declare the rights and other legal relations of any interested party seeking such declaration . . . ."  Again, this a federal claim, but the Debtor refers to the Colorado Usury Statute too.  The Debtor's final claim is titled "Equitable Subordination of Claim, 11 U.S.C. § 510."  Compl. Third Claim for Relief.  This cause of action is exclusively under the federal Bankruptcy Code and has nothing to do with Colorado law.  To summarize the claims, they all arise out of federal bankruptcy law (although the Debtor also asks the Court to apply the Colorado Usury Statute as though it sits in diversity).

"Federal principles of choice of law apply in cases arising out of federal law." *Kojima v. Grandote Int'l Ltd. Liability Co. (In re Grandote Country Club Co., Ltd.)*, 208 B.R. 218, 224 (D. Colo. 1997).  Bankruptcy is no exception.  "[T]he broad and complex jurisdiction exercised by bankruptcy courts arises not from diversity but from federal bankruptcy law and the Supreme Court has never extended its holding in *Klaxon* to cases involving bankruptcy courts."  *Knauer v. Kitchens (In re E. Livestock Co., LLC)*, 547 B.R. 277, 281 (Bankr. S.D. Ind. 2016).  Instead, in *Vanston Bondholders Protective Comm. v. Green*, 329 U.S. 156 (1946), the Supreme Court seemingly endorsed an independent federal choice of law analysis in bankruptcy cases.  *Id.* at 161-62 ("In determining what claims are allowable and how and how a debtor's assets shall be distributed, a bankruptcy court does not apply the law of the state where it sits.").

Although there is a split of authority on the issue, the Court finds that in an Adversary Proceeding like this, the court must apply federal choice of law rules.  *Liberty Tool & Mfg. v. Vortex Fishing Sys., Inc. (In re Vortex Fishing Sys., Inc.)*, 277 F.3d 1057, 1069 (9th Cir. 2002).  *See also Berger v. AXA Network LLC*, 459 F.3d 804, 809-10 (7th Cir. 2006) ("[O]ur task, when the underlying claim is a *federal* claim, is to fashion a *federal* choice of law rule.") (emphasis in original); *Lindsay v. Beneficial Reinsurance Co. (In re Lindsay)*, 59 F.3d 942, 948 (9th Cir. 1995) ("In federal question cases with exclusive jurisdiction in federal court, such as bankruptcy, the court should apply federal, not forum state, choice of law rules."); *Resolution Trust Corp. v. Chapman*, 29 F.3d 1120, 1124 (7th Cir. 1994) (when state law is borrowed in a *federal* question suit, the choice of "which [state] law to select is itself a question of *federal* law")[65]  The United States Court of Appeals for the Tenth Circuit precedent (albeit not in the bankruptcy context) also suggests that the Court should not resort to state choice of law rules when adjudicating federal questions.  *See Held v. Manufacturers Hanover Leasing Corp.*, 912 F.2d 1197, 1202-03 (10th Cir. 1990) (adopting and applying Restatement (Second) of Conflict of Laws principles for choice of law determination regarding federal claim without reference to State law).  Courts within the confines of the Tenth Circuit are in

---

[65]      Contrary authority includes:  *Gaston & Snow (In re Gaston & Snow)*, 243 F.3d 599 (2d Cir. 2001) (in the absence of a significant federal policy, bankruptcy courts should apply conflict of laws rules from the state in which the bankruptcy court is located); *Amtech Lighting Serv. Co. v. Payless Cashways, Inc. (In re Payless Cashways)*, 203 F.3d 1081, 1084 (8th Cir. 2000) (stating without any analysis that "[t]he bankruptcy court applies the choice of law rules of the state in which it sits."); *Compliance Marine, Inc. v. Campbell (In re Merritt Dredging Co., Inc.)*, 839 F.2d 203, 206 (4th Cir. 1988) ("[I]n the absence of a compelling federal interest which dictates otherwise, the *Klaxon* rule should prevail where a federal bankruptcy court seeks to determine the extent of a debtor's property interest.").

accord.  *See Weinman v. McCloskey,* 2015 WL 1528896, at *5 (D. Colo. Mar. 31, 2015) ("Where, as here, federal question jurisdiction is invoked [under a bankruptcy statute], federal courts generally apply federal common law principles to resolve choice of law disputes.").

Typically, federal choice of law rules require application of Restatement Section 187.  *Held,* 912 F.2d at 1203; *PNC Bank v. Sterba (In re Sterba)*, 852 F.3d 1175, 1179 (9th Cir. 2017); *Vortex Fishing*, 277 F.3d at 1069.  However, interstate usury is a unique type of issue.  The Supreme Court has announced special choice of law rules with respect to interstate interest rates.

The seminal decision is *Seeman*, 47 S. Ct. 626.  In *Seeman*, the United States Supreme Court confirmed a choice of law test giving primacy to contractual provisions and the place of performance:

> Respondent, a Pennsylvania corporation having its place of business in Philadelphia, could legitimately lend funds outside the state, and stipulate for repayment in Pennsylvania in accordance with its laws, and at the rate of interest there lawful, even though the agreement for the loan were entered into in another state, where a different law and a different rate of interest prevailed.  In the federal courts, . . .
>
>> 'The general principle in relation to contracts made in one place, to be executed in another, is well settled.  They are to be governed by the law of the place of performance, and if the interest allowed by the laws of the place of performance is higher than that permitted at the place of the contract, the parties may stipulate for the higher interest, without incurring the penalties of usury.'

*Id.* at 627 (quoting *Andrews*, 38 U.S. at 77-78).  The Supreme Court also endorsed the "converse of the rule":

> 'If the rate of interest be higher at the place of the contract than at the place of performance the parties may lawfully contract in that case also for the higher rate.'

*Id.* (quoting *Miller v. Tiffany*, 68 U.S. 298, 310 (1863)).  The Supreme Court recognized a "qualification": "the parties must act in good faith, and [] the form of the transaction must not 'disguise its real character.'"  *Seeman*, 47 S. Ct. at 628.

The *Seeman* choice of law approach to interstate usury disputes conforms with a long and unbroken line of other Supreme Court cases (in addition to *Andrews*, 38 U.S. 65, and *Miller*, 68 U.S. 298): *Peyton v. Heinekin*, 20 L. Ed. 679 (1872) ("Nor is there any validity in the objection that the contract was usurious . . . That State [New York] was the place of performance, and hence it was legitimate to fix the rate of interest there allowed by law."); *Junction R.R. Co. v. Bank of Ashland*, 79 U.S. 226, 227 (1870) ("With regard to the question what law is to decide whether a contract is, or is not, usurious, the general rule is the law of the place where the money is made payable; although it is also held that the parties *may* stipulate [otherwise].");  *Bedford v. E. Bldg. & Loan Ass'n of Syracuse*, 181 U.S. 227, 242 (1901) ("[T]he transactions were not usurious under the laws of New York, where the notes were payable.")  And, *Seeman* is not a historic relic.  Instead, it forms the basis for a portion of the modern Uniform Commercial Code and has continued to be cited by federal and state courts, as well as commentators, up until the present.

So, to the extent that the Court is called upon to apply federal choice of law principles to the federal claims asserted by the Debtor, *Seeman* supplies the answer. The Promissory Note itself stipulated to "FEDERAL LAW APPLICABLE TO AN FDIC INSURED INSTITUTION AND TO THE EXTENT NOT PREEMPTED BY FEDERAL LAW, THE LAWS OF THE STATE OF WISCONSIN . . . ."[66]  The Promissory Note never mentions Colorado law.  If DIDA Section 1831d does not apply, then, contractually, the Court should look to Wisconsin law and secondarily, the "place of performance" which is synonymous with the place of payment.  The Promissory Note required CMS to pay "Bank of Lake Mills, its successors and/or assigns" the principal amount of $550,000 plus interest at the Wisconsin offices of Bank of Lake Mills, "or at such other location or in such manner as designated by [Bank of Lake Mills]."[67]  Thus, Wisconsin is the place of performance.  There is no evidence that payment was ever made in Colorado.[68]

Thus, under federal choice of law principles as confirmed in *Seeman*, the Court should apply substantive Wisconsin law (if DIDA Section 1831d does not govern).  And, it is undisputed that under substantive Wisconsin law, the interest rate in the Promissory Note is valid.  It is not usurious because there is no interest rate cap applicable to corporations in Wisconsin.

**C.    Under Colorado Choice of Law Principles, Wisconsin Substantive Law Applies, so the Promissory Note Interest Rate Is Permissible.**

The Court already has determined that the Promissory Note interest rate is permissible under DIDA Section 1831d, which allows interest to be derived from Wisconsin substantive law.  Further, the Court has determined that if DIDA Section 1831d is inapplicable, then federal conflict of laws principles also direct the Court to Wisconsin substantive law.  However, the Debtor disagrees and invites the Court to

---

[66]    Ex 1 ¶ 15(c).

[67]    *Id.*

[68]    The Court also has no evidence that either Bank of Lake Mills or the Lender provided a designation identifying any non-Wisconsin location for payment of the debt under the Promissory Note.

utilize Colorado choice of law analysis.  For good measure, the Court examines Colorado conflicts of law under both statutory and common law.  In the end, even Colorado choice of law rules dictate that the substantive law of Wisconsin controls the usury question.  And, under Wisconsin substantive law, the huge Promissory Note interest rate is just fine.

      **1.**      <u>Under the Choice of Law Provisions of the Colorado UCC, Wisconsin Substantive Law Applies, so the Promissory Note Interest Rate Is Permissible</u>.

The Colorado Uniform Commercial Code (the "UCC"), COLO. REV. STAT. § 4-1-101 *et seq.*, is designed to "simplify, clarify, and modernize the law governing commercial transactions . . . and  . . . to make uniform the law among the various jurisdictions."  COLO. REV. STAT. § 4-1-103(a).  Article 3 of the UCC governs negotiable instruments.  Under the UCC, a "negotiable instrument" means "an unconditional promise or order to pay a fixed amount of money, with or without interest or other charges . . . ."  COLO. REV. STAT. § 4-3-104.  Promissory notes typically are classic "negotiable instruments" governed by the UCC.  COLO. REV. STAT. § 4-3-104(e).  In this Adversary Proceeding, the Debtor has repeatedly acknowledged that the Promissory Note is a "negotiable instrument."[69]

The UCC provides a choice of law rule applicable to transactions within its purview, such as negotiable instruments.  COLO. REV. STAT. § 4-1-301 is titled "parties' power to choose applicable law" and states:

> Except as otherwise provided in this section, when a transaction bears a reasonable relation to this state and also to another state . . ., the parties may agree that the law either of this state or of such other state . . . shall govern their rights and duties.

COLO. REV. STAT. § 4-1-301(a).

> Where there is no agreement as to the governing law, the Act is applicable to any transaction having an 'appropriate' relation to any state which enacts it.  Of course, the Act applies to any transaction which takes place in its entirety in a state which has enacted the Act.  But the mere fact that suit is brought in a state does not make it appropriate to apply the substantive law of that state.  Cases where a relation to the enacting state is not "appropriate" include, for example, those where the parties have clearly contracted on the basis of some other law, as where the law of the place of

---

[69]     Docket No. 39 at 15 ("a promissory note would be considered a negotiable instrument . . . ."); Docket No. 39 at 16 ("Even though the Promissory Note, which is a negotiable instrument under the UCC . . . .").

> contracting and the law of the place of contemplated
> performance are the same and are contrary to the law under
> the Code.

COLO. REV. STAT. § 4-1-301 Cmt. 2.  The Colorado UCC choice of law provision endorses a broad approval of party autonomy to determine applicable substantive law by contract for negotiable instruments.  Put another way, "the UCC [construing the Texas UCC], limits party autonomy in the choice of law only to the extent that it forbids them to select the law of a jurisdiction that has 'no normal relation to the transaction.'" *Woods-Tucker Leasing Corp. of Georgia v. Hutcheson-Ingram Dev. Co.*, 642 F.2d 744, 750-51 (5th Cir. 1981).

As applied to this Adversary Proceeding, the Promissory Note bears a "reasonable relation" to both Wisconsin and Colorado.  The Promissory Note bears a reasonable relation to Wisconsin since Bank of Lake Mills is a Wisconsin chartered bank located in Lake Mills, Wisconsin.  The Promissory Note states that it "is accepted by [Bank of Lake Mills] in Wisconsin"[70]  Furthermore, it provides that the place of payment is in Wisconsin ("or at such other location or in such manner as designated by [Bank of Lake Mills]").[71]  *See* COLO. REV. STAT. § 4-3-111 (stating that "an instrument is payable at the place of payment stated in the instrument").  On the other hand, the Promissory Note also bears a reasonable relation to Colorado because the borrower, CMS, listed its address as in Aurora, Colorado.  That is the only reference to Colorado in the entire Promissory Note, but it is enough.  *See Woods-Tucker Leasing*, 642 F.2d at 750 (finding "reasonable relationships" under similar circumstances).

Given the reasonable relation to both Wisconsin and Colorado, the Colorado UCC permits the parties to the Promissory Note to "agree that the law either of this state or of such other state . . . shall govern their rights and duties."  That is exactly what the Parties did.  In the Promissory Note they agreed that the Promissory Note would be governed by the substantive laws of Wisconsin (to the extent not preempted by federal law).[72]  Thus, under the Colorado UCC choice of law analysis, Wisconsin law controls the validity and enforceability of the terms of the Promissory Note.  This is essentially the same result as obtained under federal choice of law principles and *Seeman*, 274 U.S. 403.  In fact, the *Seeman* decision frequently is cited as the basis for the UCC choice of law provision.  *Woods-Tucker Leasing*, 642 F.2d at 750; *J.R. Simplot Co. v. Nestlé USA, Inc.*, 2009 WL 10678269, at *4 (D. Idaho Jul. 20, 2009).

While the Lender advocates for application of party autonomy under the Colorado UCC, the Debtor weakly protests.  First, the Debtor argues that the Deed of Trust is not a negotiable instrument governed by the UCC.  That is a true — but of no moment.  The obligation to pay stems entirely from the Promissory Note.  It is the Promissory Note that contains the giant interest rate that the Debtor seeks to eliminate as usury.  The Deed of Trust did not obligate CMS to pay anything.  In fact, CMS was

---

[70]     Ex. 1 ¶ 1.
[71]     *Id.*
[72]     Ex. 1 ¶ 15(c).

not even a party to the Deed of Trust; only Yosemite Management was.  Second, the Debtor pretends that because the Promissory Note is secured by the Deed of Trust, the Promissory Note somehow is no longer a negotiable instrument subject to the UCC. The argument is contradictory because the Debtor has admitted that the Promissory Note is a negotiable instrument.  However, it also is fallacious.

The Debtor refers to three decisions as supposed support for its position.  First, the Debtor cites *Uniwest Mortg. Co. v. Dadecor Condos., Inc.*, 877 F.2d 431, 433 (5th Cir. 1989) for the proposition that "a separate guaranty agreement, which guaranteed a loan, is not considered a negotiable instrument and does not fall within the scope of the UCC."[73]  The Court agrees.  Guaranty agreements are not necessarily commercial paper under the UCC.  But there is no dispute over a guaranty agreement in this Adversary Proceeding.  So, *Dadecor Condos.* has no relevance.  Next, the Debtor points the Court to *Resolution Trust Corp. v. 1601 Partners, Ltd.*, 796 F. Supp. 238, 240 (N.D. Tex. 1992) for the holding that a promissory note is "non-negotiable where a deed of trust was incorporated by reference into promissory note."[74]  Again, that is true.  In *1601 Partners*, the promissory note stated that "the terms, agreements and conditions of the [Deed of Trust] are by reference made a part of this instrument."  *Id*.  Because of this language, the promissory note became "subject to or governed by" another document, the Deed of Trust, so it no longer was an "unconditional" promise to pay within the scope of Article 3 of the UCC.  But, this Adversary Proceeding is different. The Promissory Note does not incorporate the Deed of Trust.  In fact, the Promissory Note does not even mention the Deed of Trust.  Instead, the Promissory Note here is an unconditional promise to pay subject to the UCC.  Finally, the Debtor notes *Horton v. M & T Bank*, 2013 WL 6172145, at *4 (N.D. Tex. Nov. 22, 2013) for the ruling that "a mortgage note is not 'within' the UCC because the Deed of Trust places a lien on real property . . . ."[75]  The citation is technically correct; but the holding is misstated or wrong. Although the *Horton* court does not explain what a "mortgage note" is, it relies exclusively on *Vogel v. Travelers Indem. Co.*, 966 S.W.2d 748, 753 (Tex. App. 1998). However, *Vogel* only held that "[b]ecause the Deed of Trust places a lien on *real* property, it [the Deed of Trust] is not governed by the UCC."  *Id*. at 753.  So, we arrive back at the uncontroversial proposition that a deed of trust is not subject to the UCC. That does nothing to negate the fact that the Promissory Note is subject to the UCC.

In the end, the Promissory Note is a negotiable instrument within the ambit of Article 3 of the UCC.  Since it is subject to the UCC, the UCC choice of law statute applies.  Colo. Rev. Stat. § 4-1-301 permits the parties broad autonomy to select the governing substantive law for a negotiable instrument so long as there is a reasonable relationship.  There certainly was a reasonable relationship with Wisconsin since Wisconsin is where Bank of Lake Mills is located and the Promissory Note was accepted.  Further, and perhaps most importantly, Wisconsin is the place of payment. Under these circumstances, the Colorado UCC requires that the parties' selection of

---

[73]     Docket No. 41 at 6.
[74]     *Id*. at 6-7.
[75]     Docket No. 41 at 7.

Wisconsin law as the governing substantive law must be honored.  And, under Wisconsin law, the interest rate in the Promissory Note is valid.

**2.      Under General Colorado Choice of Law Principles, Wisconsin Substantive Law Applies so the Promissory Note Interest Rate Is Permissible.**

Having already ruled against the Debtor's choice of law position on multiple grounds (DIDA Section 1831d, federal choice of law, and the Colorado UCC), the Court is not obligated to consider general Colorado choice of law principles.  However, even if the Court were wrong about all the foregoing choice of law analysis, the application of general Colorado choice of law principles also does not result in a ruling in the Debtor's favor.

"Generally, Colorado enforces contractual choice of law provisions, and follows the Restatement (Second) of Conflict of Laws § 187, in determining the enforceability of these provisions."  *Amer. Express Fin. Advisors, Inc. v. Topel*, 38 F. Supp. 2d 1233, 1238 (D. Colo. 1999) (citations omitted). *See also Century 21 Real Estate Corp. v. Meraj Int'l Inv. Corp.*, 315 F.3d 1271, 1281 (10th Cir. 2003) ("Colorado has adopted the approach of the Restatement (Second) of Conflicts of Laws in resolving contract choice of law questions."); *Mountain States Adjustment v. Cooke*, 412 P.3d 819, 823 (Colo. Ct. App. 2016) (same).  Both the Debtor and the Lender focused on Restatement Section 187 in their Closing Arguments and Supplemental Legal Briefs.

Restatement Section 187 states, in relevant part:

(2)  The law of the state chosen by the parties to govern their contractual rights and duties will be applied, even if the particular issue is one which the parties could not have resolved by an explicit provision in their agreement directed to that issue, unless either

(a)  the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or

(b)  application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.

Under Restatement Section 187, the parties' choice of law is effective "unless there is no reasonable basis for their choice or unless applying the law of the state so chosen

32

would be contrary to the fundamental policy of a state whose law would otherwise govern." *FBS Credit, Inc. v. Estate of Walker*, 906 F. Supp. 1427, 1429 (D. Colo. 1995) (citing *Hansen v. GAB Bus. Serv., Inc.*, 876 P.2d 112 (Colo. Ct. App. 1994)). So, Colorado courts will enforce contractual choice of law provisions unless a party can prove one of the two exceptions in Restatement Section 187(2). *In re Brock*, 494 B.R. 534, 541 (Bankr. D. Colo. 2013).

The Debtor makes no serious argument for the Restatement Section 187(2)(a) exception to the Parties' chosen law. Clearly, Wisconsin has a substantial relationship to the parties and the Promissory Note transaction. As previously noted, Bank of Lake Mills is a Wisconsin chartered bank located in Lake Mills, Wisconsin. The Promissory Note states that it "is accepted by [Bank of Lake Mills] in Wisconsin."[76] Furthermore, it provides that the place of payment is in Wisconsin ("or at such other location or in such manner as designated by [Bank of Lake Mills]").[77] That is quite enough. *See Hansen*, 876 P.2d at 113 (finding reasonable basis for applying New York law where, even though neither party was presently located in New York, defendant was previously headquartered in New York).

Thus, the Debtor centers its argument on the Restatement Section 187(2)(b) exception to the parties' chosen law. There are three main elements to that exception as applied to this Adversary Proceeding: (1) Colorado must have a "materially greater interest" than Wisconsin in the substantive law governing interest rates; (2) the application of Wisconsin substantive law governing interest rates must be "contrary to a fundamental policy" of Colorado; and (3) Colorado would be the chosen substantive law "in the absence of an effective choice by the parties." To override the Parties' agreement to apply Wisconsin substantive law, the Debtor must demonstrate that all three elements of the exception are satisfied.

The Debtor failed to establish that Colorado has a "materially greater interest" than Wisconsin in the substantive law governing interest rates. Again, there were two parties to the Promissory Note: Bank of Lake Mills and CMS. Bank of Lake Mills is based in Wisconsin, while CMS listed a Colorado address. So, there is equal balance in terms of the location of Bank of Lake Mills and CMS. But, the Promissory Note contains two other provisions that shift the center of gravity to Wisconsin. Bank of Lake Mills accepted the Promissory Note in Wisconsin. The Debtor acknowledges that "the [Promissory] Note was made in Wisconsin."[78] And, perhaps most importantly of all, CMS agreed to pay in Wisconsin. So, Wisconsin is the "place of payment" under the Promissory Note. Notably, except for referring to Colorado as the location of CMS, the Promissory Note contains no reference to Colorado whatsoever. Based upon the Promissory Note itself, the Court assesses that Wisconsin has a "materially greater interest" than Colorado in the substantive law governing interest rates and usury. The Debtor really has only one thing going for it in the "materially greater interest" equation. Yosemite Management executed the Deed of Trust pledging the Colorado Property as

---

[76]     Ex. 1 ¶ 1.
[77]     *Id.*
[78]     Docket No. 36 at 8.

security for the repayment of the debt evidenced by the Promissory Note.  However, the main issue in this Adversary Case is whether the Promissory Note constitutes a valid and enforceable debt.  The Debtor's attack is on the interest rate contained in the Promissory Note.  The Deed of Trust has no bearing on that issue.  Thus, the Debtor fails to show Colorado has a "materially greater interest" than Wisconsin on interest rates and usury.  *See Brock*, 494 B.R. at 542 ("the Bank failed to demonstrate how any interest of Colorado is materially greater than California's interest . . . .").  The Restatement Section 187(2)(b) exception collapses.

The Debtor also fails to prove that application of Wisconsin substantive law concerning interest rates is "contrary to a fundamental policy" of Colorado.  Clearly, Wisconsin and Colorado have contrary or different policies:  Colorado has intervened in the market to establish a 45% interest cap on commercial transactions; Wisconsin has taken a hands-off approach, allowing corporations to use their own judgment and contract for any interest rate they wish.  However, the question is not whether Wisconsin substantive law is merely contrary to a policy of Colorado.  And, the question also is not whether Colorado has a policy against usury.  Instead, the issue is whether *the application* of Wisconsin law would be contrary to a *fundamental* policy of Colorado.

Is corporate usury protection under COLO. REV. STAT. § 5-12-103 a fundamental policy of Colorado?  Certainly, Colorado enacted the Colorado Usury Statute.  But, surely, not every Colorado statute qualifies as a fundamental policy of Colorado.  *Continental Mortg. Investors*, 395 So. 2d 507, 509 (Fla. 1981) ("We do not think that the mere fact that there exists in Florida a usury statute . . . establishes a strong public policy against such conduct in this state where interstate loans are concerned.")  The text of the Colorado Usury Statute does not expressly identify it as a "fundamental policy."  The Colorado Usury Statute is located in Title 5 of the Colorado Revised Statutes.  Most of that title is directed to the Colorado Consumer Credit Code. COLO. REV. STAT. § 5-1-101 *et seq.*  The Colorado Consumer Credit Code does contain a section identifying "underlying purposes and policies" to protect consumers.  COLO. REV. STAT. § 5-1-102(2).  But, none of those purposes and policies is directed to corporate usury and the need to protect corporations from bad judgments.  *See Dikeou*, 928 P.2d at 1293 (recognizing "the distinct differences between the consumer loan and nonconsumer loan settings" and declining to find any policy benefit in applying consumer protections to nonconsumer transactions under the Colorado Usury Statute especially where the debtor was not an "unsophisticated borrower").  The Debtor has not provided the Court with any definitive case law, legislative history, or other materials suggesting that the Colorado Usury Statute, especially as applied to corporations, is of any particularly great importance to the State of Colorado.

The best the Debtor can offer for the fundamental policy argument is snippets from two cases.  In *Dennis*, 236 F. Supp. at 692, the district court stated:  "[T]he [Colorado] legislature's condemnation of usury is manifest.  The Colorado public policy pronouncements against retention of usurious interest have been strong."  The *Dennis* court did not identify any specific support for its "strong" "public policy" conclusion.  Restatement Section 187(2) choice of law was not at issue.  So, the *Dennis* court did

not assess whether the application of another State's law would violate a *fundamental* policy of Colorado.  The Debtor also cites a passage from *Tucker v. R.A. Hanson Co., Inc.*, 956 F.2d 215 (10th Cir. 1992):

> The original conception of the public policy exception was that some causes of action were so repugnant to the values of the forum state that the state courts would feel compelled to close their doors to them.  State proscriptions against usury, prostitution, and gambling were examples of the kind of public policies that for a state court to countenance such activities would in Justice Cardozo's words, "violate some fundamental principle of justice, some prevalent conception of morals, some deep-seated tradition of the commonweal." *Loucks v. Standard Oil Co. of New York*, 224 N.Y. 99, 120 N.E. 198, 202 (1918).  Since every law is an expression of the public policy of the state, some higher threshold is needed to prevent the forum's law from being applied in every case.  A strict construction of the public policy exception was felt necessary to prevent the whole field of conflicts of law from collapsing in on itself.

*Id.* at 218.  Seizing onto the appellate court's statement that proscriptions against usury were "examples of the kind of public policies that for a state court to countenance such activities would in Justice Cardozo's words, 'violate some fundamental principle of justice, some prevalent conception of morals, some deep-seated tradition of the commonweal,'" the Debtor concludes that the application of Wisconsin interest rate law would violate a fundamental policy of Colorado.

The Debtor's argument has some allure.  But the issue in *Tucker* was very different from this Adversary Case.  In *Tucker*, the central question was whether a New Mexico court could enforce an indemnification clause.  Neither usury nor Colorado policies had anything to do with the case.  So, any passing mention of usury is no more than dicta.  Further, in *Loucks*, the decision cited for support by the *Tucker* court, usury also was not an issue.  Instead, *Loucks* involved only the question of whether a federal court could assume jurisdiction over and enforce a Massachusetts statute providing for the payment of damages resulting from negligence where the victim of the negligence was a New York resident traveling through Massachusetts.  Again, any passing mention of usury is of no real moment.  The decision did not involve either usury or Colorado policies.

Thus, although another close call, the Court determines that the Debtor failed to show that application of Wisconsin interest rate law in a commercial transaction with a Wisconsin state chartered bank would violate Colorado fundamental policy.  Indeed, Colorado courts historically have allowed the application of the law of other States in similar circumstances.  For example, in *Baxter v. Beckwith*, 137 P. 901 (Colo. 1914), the Colorado Supreme Court determined:

> The parties may legally stipulate for the payment of interest according to the laws of the state where the instrument is made, or according to the laws of the place of payment, and the rate thus agreed upon may be recovered, although it may be illegal under the laws of the other state. . . .
>
> Ordinarily the validity of a contract is to be determined by the law of the place where made, and, the note before us having been made and specifically made payable in Iowa, its validity and the validity of its provision for interest is to be determined by the law of that state.

*Id.* at 902-03 (citations omitted).  *See also McKay's Estate v. Belknap Sav. Bank*, 59 P. 745, 747 (Colo. 1899) ("'When, at the place of contract, the rate of interest differs from that of the place of payment, the parties may stipulate for either rate, and the contract will govern, the parties having the right of election as to the law of which place their contract is to be governed.'") (citation omitted).  As noted by the Florida Supreme Court, usury protections are not "fundamental to a legal system".  *Continental Mortg.*, 395 So. 2d at 509.  "The defense of usury is a creature entirely of statutory regulation, and is not founded upon any common-law right, either legal or equitable."  *Id.*  Further, it is important to confirm that the Promissory Note is a commercial transaction between a financial institution and a corporation, which should be able to protect its own interests. *Id.*, 395 So. 2d at 509 ("The few courts that do rely on a public policy exception in a usury-choice of law situation invariably are dealing with the individual and often consumer, borrower.").  In such circumstances, there is far less need for the Court to engage in choice of law machinations and negate the parties' own choice of applicable substantive law.  Instead, the freedom to contract — and sometimes make a bad corporate decision — is a far more fundamental policy than statutory usury to protect corporations.

Finally, in connection with analysis under Restatement 187(2)(b), the Debtor failed to establish that Colorado would be the chosen substantive law "in the absence of an effective choice by the parties."  In order to determine the applicable substantive law "in the absence of an effective choice by the parties," the Court applies Section 188(2) of the Restatement (Second) of Conflict of Laws ("Restatement Section 188(2)") which states:

> (2) In the absence of an effective choice of law by the parties (see § 187), the contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:
>
> (a) the place of contracting,
>
> (b) the place of negotiation of the contract,

      (c) the place of performance,

      (d) the location of the subject matter of the contract, and

      (e) the domicil, residence, nationality, place of
          incorporation and place of business of the parties.

Restatement Section 188(2).  The Court analyzes each of the relevant factors.

With respect to the "place of contracting," the Promissory Note states that it "is accepted by [Bank of Lake Mills] in Wisconsin"[79]  The Debtor acknowledges that "the [Promissory] Note was made in Wisconsin."[80]  Thus, as a matter of Colorado law, the place of contracting is Wisconsin.  *Denver Truck Exch. v. Perryman*, 307 P.2d 805, 809-10 (Colo. 1957) (noting that place of contracting is determined by parties' intention and as rule is considered to be place where offer is accepted).  Regarding the "place of negotiation of the contract," neither the Debtor nor the Lender presented the Court with any evidence concerning the location for contract negotiations.  So, that factor cannot be weighed in the analysis.  The "place of performance" of the Promissory Note is Wisconsin.  That is because the Promissory Note designates Wisconsin as the place for payment.  *See* COLO. REV. STAT. § 4-3-111 (stating that "an instrument is payable at the place of payment stated in the instrument").  With respect to the "location of the subject matter of the contract," neither the Debtor nor the Lender offered the Court any evidence about the subject matter of the Promissory Note.  All the Court knows for sure is that CMS borrowed $550,000 from Bank of Lake Mills for "business purposes."[81]  The Court is unaware of the business of CMS or where such business was conducted.  The Court is in the dark concerning how the funds were used; except that the Court can surmise that, because the Property was owned by Yosemite Management, not CMS, the loan proceeds were not used to purchase the Property pledged under the Deed of Trust.  The Court does not know the relationship between CMS and Yosemite Management.  Ultimately, the Court cannot weigh the "subject matter of the contract" because of the lack of evidence.  Finally, respecting "domicil, residence . . ., place of incorporation, and place of business of the parties," the Court has limited information that results in a wash.  The original lender is a state bank chartered in Wisconsin and its offices are located in Wisconsin.  The Lender is from New York.  The Court has not been advised concerning the residence and place of incorporation of CMS, but CMS listed its "principal place of business" as Colorado.  The Debtor is from Colorado.  Considering all of the Restatement Section 188(2) factors for which there is evidence, it is clear that the balance tips toward selection of Wisconsin law as the applicable law in the absence of an effective choice of law in the Promissory Note.[82]

---

[79]     Ex. 1 ¶ 1.
[80]     Docket No. 36 at 8.
[81]     Ex. 1 ¶¶ 1 and 8(b).
[82]     In its Order for Additional Briefing, the Court asked the Parties to provide additional legal briefing concerning the potential application of Sections 195 and 203 of the Restatement (Second) of Conflict of Laws ("Restatement Sections 195 and 203").  Neither the Debtor nor the Lender argued that Restatement Section 195 governs the choice of law issues in this Adversary Proceeding.  The Court concurs, since

D.    __The Debtor's Focus on the Deed of Trust in Misplaced__.

The predicate for the bankruptcy claims (under 11 U.S.C. §§ 502 and 510) asserted in the Complaint is that the Promissory Note is usurious under the Colorado Usury Statute.  In the Complaint, the Debtor alleged:

- "the WBL Note is usurious on its face, providing for a default interest rate of 130.363% per annum";

- "The WBL Note provided for a default interest rate of 130.363%";

- "Pursuant to the usurious terms of the WBL Note. . . ."

- "Based on this usurious interest rate, the Borrower and Guarantors subject to the WBL Note would be forced to pay WBL a total amount that included interest well exceeding the legal limit."

- "The filing of the foreclosure and the WBL Proof of Claim constitute an attempt to collect a usurious debt and present a justiciable dispute";

- "WBL's claim for interest charged on the WBL Note is usurious in excess of the lawful amount that can be charged"; and

---

Restatement Section 195 applies only "in the absence of an effective choice of law by the parties," while in the Promissory Note, the Parties did agree to a specific applicable law.  Furthermore, Restatement Section 195 provides that in the absence of an effective choice of law, the contract will be governed by "the local law of the state where the contract requires that repayment be made, unless . . . some other state has a more significant relationship . . . . to the transaction and the parties  . . . ."  As already explained, Wisconsin is the place of payment and also has the most significant relationship to the Promissory Note.  So, Restatement Section 195 offers no aid for the Debtor.

In its Supplemental Legal Brief, the Debtor made an argument for the application of Restatement Section 203.  That Section states:

> The validity of a contract will be sustained against a charge of usury if it provides for a rate of interest that is permissible in a state to which the contract has a substantial relationship and is not greatly in excess of the rate permitted by the general usury law of the state of the otherwise applicable law under the rule of § 188.

Since Restatement Section 203 is directed specifically at usury (which is at the heart of this Adversary Proceeding), the Court assumed that Section was most relevant.  But neither the Debtor nor the Lender focused on it very much.  In any event, Restatement Section 203 results in the selection of Wisconsin law.  That is because CMS and Bank of Lake Mills chose Wisconsin law, the Promissory Note has a substantial relationship with Wisconsin, and the high interest rate is not in excess of the rate permitted in Wisconsin.  Also, as explained previously, Wisconsin law is the applicable law under a Restatement Section 188 analysis.

- "the WBL Note was usurious . . . ."[83]

The Debtor's claims refer specifically to the Colorado Usury Statute.[84]  And, the relief requested flows from the assertion of usury.  In the First Claim for Relief, the Debtor asks that the Court make "a declaration that the interest charged under said note [Promissory Note] is usurious" and, as a result of such declaration, also declare "the extent, priority, and validity" of [the Lender's] lien.  In the Second Claim for Relief, the Debtor asks the Court to completely disallow the Lender's Proof of Claim based on usury.  Finally, in the Third Claim for Relief, the Debtor desires equitable subordination of the Lender's Proof of Claim because the Lender "sought to collect from and have [the Debtor] pay a greater rate of interest than is allowed by Colorado law and [the Lender] knew that the WBL Note was usurious . . . ."[85]

Given the foregoing, the Court has focused on the Promissory Note and whether the Promissory Note is usurious.  To make that decision, the critical issue is the applicable law governing the Promissory Note.  But, in its Closing Argument and Supplemental Legal Briefs, the Debtor has tried to shift ground and argue about the Deed of Trust.  For example, the Debtor suggests that that the Lender's Proof of Claim is "pursuant to *a Deed of Trust bearing an interest rate* in excess of Colorado usury laws."[86]  From this premise, the Debtor emphasizes that the Deed of Trust involves the Colorado Property.  And, the Debtor repeatedly points out that the Deed of Trust includes an express Colorado choice of law provision.

The Court does not accept the Debtor's misdirection.  The Deed of Trust does not bear any interest rate and cannot be usurious.  The Promissory Note and the Deed of Trust are two different legal documents serving distinct purposes.  The Promissory Note is a promise to pay.  And, only the Promissory Note contains an interest rate.  As already explained, the Promissory Note is a negotiable instrument.  *See* COLO. REV. STAT. § 4-3-104(a) ("'negotiable instrument' means an unconditional promise to pay a fixed amount of money, with or without interest or other charges").  It is also an "evidence of debt."  *See* COLO. REV. STAT. § 38-38-100.3(8) ("'Evidence of debt' means a writing that evidences a promise to pay . . . such as a promissory note . . . .").  For reasons that the Court cannot fathom, CMS agreed to borrow $550,000 from the Bank of Lake Mills and repay such principal plus interest at the incredibly high rate of 120.86% per annum.  The Debtor has raised the issue of whether the Promissory Note interest rate is usurious.

The Deed of Trust is something altogether different.  It is not an independent promise to pay.  It does not contain a separate interest rate.  The Deed of Trust is only a security device by which a party, Yosemite Management, pledged its own real property to secure the monetary obligation evidenced by the Promissory Note.  *See* COLO. REV. STAT. § 38-38-100.3(7) ("'Deed of trust' means a security instrument containing a grant

---

[83]   Compl. ¶¶ 15, 24, 25, 27, 28, 32, and 36.
[84]   Compl. ¶¶ 23, 28, and 32.
[85]   Compl. ¶ 36.
[86]   Docket No. 36 at 1.

to a public trustee together with a power of sale.")  Further, the Deed of Trust governs the process of foreclosure.  Naturally, deeds of trust are governed by local law where real property is located and subject to foreclosure.  So, as is typical, since Yosemite Management pledged the Property located in Colorado, the Deed of Trust is governed by Colorado law.

But, that does not mean that somehow the choice of law in the Deed of Trust can be used to transmogrify the choice of law in the Promissory Note as the Debtor seems to imply.  Consider a typical large credit facility in the United States.  A national bank based in California loans $1 billion to a large company headquartered in Colorado but with ten manufacturing facilities in ten different States.  One promissory note is executed by the Colorado borrower providing for application of California law (because the national bank is based in California).  As security, the Colorado borrower executes ten deeds of trust (1 for each of its ten manufacturing facilities in ten different States).  Because the deeds of trust involve real property, each of the deeds of trust will be governed by the local law applicable where each manufacturing facility is located.  But the deeds of trust cannot be used to change the choice of law in the promissory note.  Instead, the validity of the promissory note can only be governed by a single applicable law as selected in the promissory note.  The ten different laws in the ten different deeds of trust have no bearing on the validity of the promissory note or its choice of law.

So it is in this case.  CMS executed the Promissory Note, governed by federal or Wisconsin law (if not preempted), in favor of Bank of Lake Mills.  The Promissory Note is the evidence of the debt.  Any usury attack can only challenge the Promissory Note.  The Deed of Trust solely served to provide some security by pledging the Colorado Property.  The Deed of Trust cannot be usurious.  So, the choice of law in the Deed of Trust has no bearing on whether the Promissory Note is usurious.  Thus, the Court focuses on the Promissory Note.

It is, as the Court has stated, a complete mystery why Yosemite Management, which was not the borrower under the Promissory Note, voluntarily agreed to pledge its Property under the Deed of Trust to secure payment of the Promissory Note.  Given the rate of interest under the Promissory Note, that decision seems like a gross deviation from sound business judgment.  And, the Court has no idea why the Debtor decided to purchase the Property from Yosemite Management knowing all along that it was subject to the Deed of Trust and that CMS had defaulted on the Promissory Note.  That transaction appears ill-advised at best and virtually insane at worst.  But whatever shenanigans Yosemite Management and the Debtor were engaged in is beside the point.  The Court assesses usury based on the Promissory Note, not based on the Deed of Trust.

## VII.    <u>Legal Conclusions</u>.

No matter which choice of law approach is utilized (DIDA Section 1831d, federal common law, Colorado UCC, or Colorado general common law principles under Restatement Section 187 and 188), all roads lead to Wisconsin as the proper substantive law governing the Promissory Note.

## A.   The Debtor Fails on its First Claim for Relief: Declaratory Judgment.

In its First Claim for Relief, the Debtor sought a declaration that "the interest charged under [the Promissory Note] is usurious under C.R.S. § 5-12-103."[87]  The Debtor characterized the cause of action as for "Declaratory Judgment" and also cited Fed. R. Civ. P. 7001(9) which provides that adversary proceedings include "a proceeding to obtain a declaratory judgment . . . ."

Federal law governs the allocation of the burden of proof for a declaratory judgment action brought in bankruptcy to determine issues concerning administration of the bankruptcy estate.  *Rex-Tech Int'l, LLC v. Rollings (In re Rollings)*, 451 Fed. Appx. 340, 345 (5th Cir. 2011) (unpublished) ("federal law governs the preliminary issue of what burden of proof applies" in a bankruptcy declaratory judgment action).  And, under federal law, the burden of proof in a declaratory judgment case falls squarely on the party requesting relief:  the Debtor.  *Id.* at 346; *Weller v. Texas Guaranteed Student Loan Corp. (In re Weller)*, 316 B.R. 708, 711 (Bankr. W.D. Mo. 2004) ("The party seeking declaratory judgment [in a bankruptcy adversary proceeding] must bear the burden of proof . . . ."); *Wilcox v. Stroup (In re Willcox)*, 329 B.R. 554, 562 (Bankr. D. S.C. 2005) ("the burden of proof in declaratory judgment actions lies, as a general principle of law, with the moving party who is held to 'have assumed the risk of nonpersuasion'").

The Debtor failed to meet its burden to establish entitlement to a declaration that the Promissory Note is usurious.  Instead, since Wisconsin substantive law controls the Promissory Note, the extraordinarily high interest rate in the Promissory Note — 120.86% per annum — is valid and permissible.  Wisconsin allows for freedom to contract without any corporate usury.  So, the Court declines to declare the Promissory Note to be usurious and denies any related relief concerning lien avoidance.

## B.   The Debtor Fails on its Second Claim for Relief:  Claim Objection.

In its Second Claim for Relief, the Debtor objected to the Lender's Proof of Claim and requested that the Proof of Claim be disallowed under Section 502(b) and "pursuant to applicable state law, C.R.S. § 5-12-103" because the Lender's "claim for interest charged on the [Promissory Note] is usurious and in excess of the lawful amount that can be charged."[88]

Section 502 governs the claims objection and allowance process and provides:

> (a)    A claim or interest, proof of which is filed under section 501 of this title, is deemed allowed, unless a party in interest, including a creditor of a general

---

[87]    Compl. at 3.
[88]    Compl. at 4.

partner in a partnership that is a debtor in a case
under chapter 7 of this title, objects.

(b)     Except as provided in subsections (e)(2), (f), (g), (h)
and (i) of this section, if such objection to a claim is
made, the court, after notice and a hearing, shall
determine the amount of such claim in lawful currency
of the United States as of the date of the filing of the
petition, and shall allow such claim in such amount,
except to the extent that—

(1)     such claim is unenforceable against the debtor
and property of the debtor, under any
agreement or applicable law.

The Lender timely filed the Proof of Claim, asserting a secured claim in the
amount of $658,652.95, and attached supporting information including the Promissory
Note and Deed of Trust.  Under Fed. R. Bankr. P. 3001(f), "[a] proof of claim executed
and filed in accordance with these rules [the Federal Rules of Bankruptcy Procedure] . .
. constitute[s] prima facie evidence of the validity and amount of the claim."  The Debtor
objected through the Complaint.  So, Section 502(b) was triggered.

As such, this Court must "determine the amount of such claim."  In making its
determination under Section 502(b), the Court is required to apply the following burdens
of proof:

The objecting party has the burden of going forward with
evidence supporting the objection. . . .  Such evidence must
be of probative force equal to that of the allegations
contained in the proof of claim. . . .  However, an objection
raising only legal issues is sufficient. . . .   Once the objecting
party has reached this threshold, the creditor has the
ultimate burden of persuasion as to the validity and amount
of the claim.

*Wilson v. Broadband Wireless Int'l Corp.* (*In re Broadband Wireless Int'l Corp.*), 295
B.R. 140, 145 (10th Cir. BAP 2003) (internal citations omitted).  *See also In re Harrison*,
987 F.2d 677, 680 (10th Cir.1993) (setting forth burdens).

To summarize in the context of this Adversary Proceeding, the Lender timely and
properly filed the Proof of Claim in compliance with Section 501 and Fed. R. Bankr. P.
3001.  So, the Debtor, as the objecting party, assumed the burden to attack the validity
of the Proof of Claim either based on the law or evidence.  The Debtor met its initial
burden by virtue of the allegations in the Complaint coupled with the legal arguments
raised at trial and in its Closing Argument and Supplemental Legal Briefs focusing on
usury.  Thus, the Lender has the ultimate burden of proving the validity and amount of
its Proof of Claim.

In this Adversary Proceeding, there are no material factual disputes.  Instead, the core contest is over applicable law.  Based upon the undisputed facts, including the choice of law provision in the Promissory Note, the Court concludes that the Lender met its ultimate burden to establish the validity and amount of the Proof of Claim.  Since Wisconsin substantive law controls the Promissory Note, the ultra-high interest rate in the Promissory Note is permissible.  So, the Court declines to disallow the Lender's Proof of Claim.  Instead, the Lender's Proof of Claim is allowed as a claim against the Debtor's Property in the amount of $658,652.95 plus interest at the rate of 120.86% per annum.  The Lender's Proof of Claim is secured by the Property under the Deed of Trust.  Furthermore, since the Debtor was not a party to the Promissory Note and has no direct obligation on such indebtedness, the Lender's Proof of Claim is only allowable *in rem* as a lien on the Property.

## C.    The Debtor Fails on its Third Claim for Relief:  Equitable Subordination.

In its Third Claim for Relief, the Debtor requested that the Lender's Proof of Claim be subordinated to the claims of general unsecured creditors under Section 510(c) which states, in relevant part:

> [A]fter notice and a hearing, the court may  . . . [u]nder principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim . . .

The United States Courts of Appeals for the Tenth Circuit instructed that a party seeking equitable subordination under Section 510(c) must demonstrate:

1.    The claimant has engaged in inequitable conduct;

2.    The conduct has injured creditors or given unfair advantage to the claimant; and

3.    Subordination of the claim is not inconsistent with the Bankruptcy Code.

*Sloan v. Zions First Nat'l Bank (In re Castletons, Inc.)*, 990 F.2d 551, 559 (10th Cir.1993) (citation omitted).  In considering these factors, "[t]he critical inquiry . . . is whether there has been inequitable conduct on the part of the party whose debt is sought to be subordinated."  *Id.* (citation omitted).

Inequitable conduct for subordination purposes encompasses three categories of misconduct:  (1) fraud, illegality, and breach of fiduciary duties; (2) undercapitalization; or (3) claimant's use of the debtor as a mere instrumentality or alter ego.  *Sender v. Bronze Group, Ltd. (In re Hedged-Inves. Assoc., Inc.)*, 380 F.3d 1292, 1301 (10th Cir. 2004).   Generally, it is not enough to simply allege that a defendant engaged in

"inequitable conduct."  The party seeking equitable subordination must allege conduct that fits within one of these three categories.  *Carter-Waters Okla., Inc. v. Bank One Tr. Co., N.A. (In re Eufaula Indus. Auth.)*, 266 B.R. 483, 489 (10th Cir. BAP 2001).

The party asserting equitable subordination bears the burden to establish the required elements by a preponderance of the evidence.  Notwithstanding, the burden and sufficiency of proof required are not uniform in all cases.  The claims of insiders and non-insiders generally are treated differently for subordination purposes.  If the claimant is an insider or a fiduciary, the party seeking equitable subordination need only show "unfair" conduct.  *Estes v. N & D Properties, Inc. (In re N & D Properties, Inc.)*, 799 F.2d 726, 731 (11th Cir.1986).  However, where non-insider claims are involved, the level of pleading and proof is significantly higher.  *Id.* at 731-32.  Although courts now agree that equitable subordination can apply to a non-insider creditor, the circumstances are "few and far between."  *Kham & Nate's Shoes No. 2, Inc. v. First Bank*, 908 F.2d 1351, 1356 (7th Cir.1990); *accord Waslow v. MNC Commercial Corp. (In re M. Paolella & Sons, Inc.)*, 161 B.R. 107, 119 (E.D. Pa.1993) ("Equitable subordination has seldom been invoked, much less successfully so, in cases involving non-insiders and/or non-fiduciaries."), *aff'd*, 37 F.3d 1487 (3d Cir. 1994).

In this Adversary Proceeding, the Debtor has not alleged that the Lender is an insider of the Debtor (as defined in Section 101(31)).  Thus, the Debtor bears the higher burden of proof applicable for non-insider equitable subordination claims.

The Debtor seeks equitable subordination of the Lender's Proof of Claim "due to [Lender's] inequitable conduct in seeking to collect from the Property and have Rent-Rite pay a greater rate of interest than is allowed by Colorado law."[89]  According to the Debtor, the Lender's effort to enforce the Promissory Note terms is "imbued with bad faith and illegality."[90]  The Debtor failed to present evidence demonstrating any of the requirements for imposition of the equitable subordination remedy.  There is no showing that the Lender's filing of the Proof of Claim based upon the Promissory Note and secured by the Deed of Trust on the Property is tantamount to fraud, illegality, or breach of fiduciary duties.  CMS contractually agreed to the extraordinarily high interest rate.  Yosemite Management pledged the Property as security for such debt under the Promissory Note.  Later, the Debtor purchased the Property from Yosemite Management.  At the time, the Debtor was aware that the Property was encumbered by the Deed of Trust securing the Promissory Note.  And, the Debtor knew that the Promissory Note was in default.  In fact, the Debtor received the benefit of a price reduction because of such default.  In retrospect, the Debtor's decision to buy the Property knowing that it was encumbered by a defaulted Promissory Note bearing 120.86% interest per annum appears insane.  The Court cannot fathom any reason why CMS agreed to the Promissory Note in the first place, why Yosemite Management voluntarily pledged the Property to secure the debt, or why the Debtor acquired the Property under such circumstances.  Clearly, CMS, Yosemite Management, and the

---

[89]     Docket No. 36 at 10.

[90]     *Id.*

Debtor made bad decisions.  But that does not mean that Bank of Lake Mills or the Lender engaged in inequitable conduct.  The Lender only seeks what it is entitled to.

## VIII.   Order and Judgment.

For the reasons set forth above, the Court finds that the Debtor failed to establish that the super-high interest rate contained in the Promissory Note is usurious. Accordingly, the Debtor is not entitled to a declaratory judgment or equitable subordination of the Lender's Proof of Claim.  The Lender ultimately satisfied its burden for allowance of the Proof of Claim *in rem* against the Property.  Therefore, the Court

ORDERS that all claims asserted by the Debtor in the Complaint are DISMISSED.  A separate Judgment consistent with the foregoing shall enter.

DATED this 17th day of May, 2019.

BY THE COURT:

Thomas B. McNamara,
United States Bankruptcy Judge